UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 21 CR 105 |
| | ) | Judge John Z. Lee |
| DENZAL STEWART | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT STEWART'S
MOTION TO RECONSIDER DETENTION AND PRETRIAL RELEASE

The UNITED STATES OF AMERICA, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant DENZAL STEWART's motion to reconsider detention and for pretrial release, Dkt. 50, and states as follows:

*Background*

On February 11, 2021, a federal grand jury indicted DENZAL STEWART and two other individuals for arson, in violation of Title 18, United States Code, Section 844(f)(1) and (2). Dkt. 1. On February 24, 2021, STEWART was arrested at O'Hare International Airport[1] and brought before Magistrate Judge Weisman for an initial appearance and arraignment. Dkt. 8. At that combined hearing, the government moved for detention pursuant to Title 18, United States Code, Section 3142(f)(1)(A), in that the arson committed was a crime of violence. The court set a detention hearing for February 26, 2021. *Id.* On February 26, 2021, the court held a detention hearing

---

[1] Though Denzal STEWART was arrested at the airport, the government has no reason to believe that he was attempting to flee prosecution.

for STEWART and his co-defendant, Lamar Taylor. With the consent of both defense counsel, the government proceeded by way of proffer at the hearing.

### *Prior Detention Hearing*

At the detention hearing, the government presented videos showing the arson of the unoccupied CTA van and a video posted to Facebook by Taylor showing, STEWART, Taylor, and Taylor's girlfriend driving towards downtown Chicago to "protest." After viewing the video and hearing argument from all parties, the court detained STEWART after finding him to be a risk of flight and a danger to the community. Dkt. 29. In evaluating the statutory factors for detention, the court found that the nature of the offense, the weight of the evidence, defendant's character, mental condition, employment history, criminal history, record in appearing in other courts and complying with conditions, and the fact that defendant was on parole at the time of the offense all weighed in favor of detention. *Id*.

### *Instant Motion*

Defendant now brings a motion seeking reconsideration of Magistrate Weisman's decision to detain him. In his motion, defendant realleges that he is not a danger to the community nor a flight risk and that conditions exist that will assure the safety of the public and defendant's appearance in court. The government disagrees. Magistrate Judge Weisman was correct in finding the defendant to be a danger to the community and a risk of flight and this court should find the same.

*Nature and Circumstances of the Offense and Weight of the Evidence*

On May 30, 2020, STEWART, along with Lamar Taylor and Darion Lindsey, lit an unoccupied CTA van on fire during the protests that were taking place in downtown Chicago after the murder of George Floyd in Minneapolis. STEWART and Lamar Taylor had no intentions to express their frustration with the murder through legitimate protests. They used the cover of a defining moment in American history to go out and cause mayhem and commit crimes in the City of Chicago. The ill intent of STEWART and Taylor is shown by the video Taylor posted to Facebook while he and STEWART were on their way to downtown Chicago on May 30, 2020.

*Facebook Live Video – Budda Ball on my way Downtown*

At the beginning of a video titled, "Budda Ball on my way downtown,"[2] Taylor is seen sitting in the front passenger seat of a vehicle, with STEWART sitting in the back-passenger seat. Taylor was wearing an orange Detroit Tigers shirt, with a blue long-sleeved shirt underneath, a Baltimore Orioles hat, plastic gloves, and a black ski mask. STEWART was in the back seat with a white tank top and is seen putting plastic gloves on his hands. Early in the video, Taylor stated, "We going down here to get busy, like everybody else," while STEWART was in the back stating, "Yeah." Taylor followed up saying, "Cuz we about to go down here and get buckwild like everyone else." STEWART replied, "You hear me." Taylor stated, "I'm tryin' to hit a lick. No justice, no peace." STEWART replied, "You hear me."

---

[2] The government will file the video "Budda Ball on my way downtown" as a video exhibit to this motion.

After Taylor requested that he do so ("Cuz put that [expletive] on your face shorty"), STEWART pulled down his black ski mask, put on a cap with a blue logo on it, and looked into the camera. Taylor later stated, "I'm trying to get that $50,000 Rolex," STEWART replied, "You hear me." Later in the video, Taylor talked about throwing a brick through a window and STEWART gave a hand acknowledgement. Throughout the video, Taylor called the person in the backseat of the vehicle "Denzal."

About four minutes and twenty seconds into the video, Taylor took off his mask. While talking, Taylor stated, "Denzal. I know his ass thirsty. Shorty tryin' to go grab him a new whip." STEWART replied, "I'm trying to grab me some jewelry …" About six minutes and thirty seconds into the video, Taylor stated, "Hey Denzal, I'm gonna tell you, don't stop running." To which STEWART replied, "Oh, I already know!" Around the seven minute thirty-five second mark, STEWART acknowledged that he'd been waiting on "this" for years, "since [he's] seen Baltimore." Throughout the video, STEWART detailed that he wanted to loot "a jewelry store" or "anything" that was open. Towards the end of the video, after Taylor stated that they haD gloves, STEWART showed the ski mask he had to the camera and stated, "and a face mask for no case."

*Compilation of video from Downtown Chicago on May 30, 2020*

Additionally, the arson of the CTA van was captured on video.[3] That video showed STEWART and Taylor setting a CTA van on fire wearing the same clothes as the video mentioned above. Some stills from the video are below:



STEWART　　　　　　　　　　　　　　　　Small Flame

In the picture above STEWART is lighting a fire in the back of the CTA van.



STEWART　　　　TAYLOR　　　　Fire

---

[3] The government can provide the court with the video ahead of the hearing and can play the video at the hearing. The video requires Genetec Video Player to view.

In the picture above, Taylor is inside the front passenger compartment of the van. While in there, a flash of fire is seen. STEWART is standing behind Taylor watching him.



STEWART TAYLOR

The above picture comes after Taylor was in the front passenger compartment of the van. After the fire is seen (picture above this one), Taylor exits the van and runs around the van, closing all the doors.



STEWART

In the picture above, STEWART is about to put a cardboard box, that he found on the ground, into the front passenger compartment of the CTA van, ostensibly to assist the growth of the fire.





The two pictures above show the CTA van on fire. The first picture is when the flames first appeared. The second picture shows people walking by the van on fire.



The picture above is after approximately eight minutes of the CTA van burning. Firemen came to the scene to put out the fire. The CTA van is destroyed.

STEWART, along with Taylor and Lindsey, committed arson, which is a crime of violence, during a time where there were a lot of people on the streets of downtown Chicago. By setting that gasoline fueled van on fire, they risked the safety and well being of people that were standing around watching it burn, any potential people in stores or buildings around the area, and the safety of the firemen that had to put out the fire. The fire lasted approximately eight minutes and there were bursts of flame that extended from the van, even while the firefighters were trying to put out the fire. This behavior shows defendant's dangerousness to the community. Fires in urban areas with buildings nearby carry an "inherent danger of injury to other persons." *United States v. Hicks*, 106 F.3d 187, 191–92 (7th Cir. 1997).

*History and Characteristics of STEWART*

STEWART's criminal history shows that he is both a danger to the community and a risk of flight. STEWART has five felony convictions. In 2013, he was convicted of residential burglary and sentenced to probation. While on probation, the Cook County State's Attorney's Office filed *four* violation of probation petitions and *two* separate warrants were issued because of his failure to appear in court and potential commissions of other offenses. Eventually, his probation was revoked, and he was sentenced to four years' incarceration at the Illinois Department of Corrections.

In 2014, he was convicted of the felony of possession of a stolen motor vehicle and sentenced to three years' incarceration at the Illinois Department of Correction. In 2016, he was convicted of the misdemeanor of resisting and obstructing a peace officer and sentenced to ten days jail at the Cook County Department of Corrections.

In 2017, he was convicted of the felony of possession of a stolen motor vehicle and sentenced to six years' incarceration at the Illinois Department of Correction. Additionally, while on pretrial release for this case in 2016, STEWART was charged with escaping electronic monitoring. In 2017, he pled guilty and was sentenced to two years' incarceration. Though none of his convictions are for crimes of violence, they still show STEWART's dangerousness to the community and show he is a high risk of failure to appear.

*Danger to Others in Community*

STEWART argues that because the aforementioned convictions are not for crimes of violence, STEWART is not a danger to the community. This premise is false and should be rejected.

STEWART's first adult conviction is for residential burglary, a crime that is defined as entering or remaining in a dwelling of a person without permission with intent to commit a felony. A person's home is the place they feel most safe and the defendant was willing to invade that sanctity to commit an additional felony. An individual that enters the home of another person with intent to commit a felony presents a danger to the public.

Additionally, though defendant claims that he did not attempt to flee when the Sheriff went to arrest him on his felony escape charge, that does not appear to be the entire story. According to the pretrial report for STEWART, the defendant was arrested on October 10, 2016 by the Cook County Sheriff for obstructing identification, resisting, and battery. On October 12, 2016, the court found probable cause to detain the defendant, which is the same date the warrant was marked as returned for the escape electronic monitoring felony. On October 24, 2016, STEWART pled guilty to resisting. Therefore, though STEWART claims that he did not flee, it appears that he did resist arrest in some way, possibly by committing a battery or an unwanted touching. Resisting a legitimate arrest by law enforcement is evidence that STEWART is a danger to the community.

***Risk of Non-Appearance or Flight***

STEWART has a terrible history of complying with court orders and conditions of release. He has violations of probation that have resulted in a custodial sentence, warrants issued for not appearing in court, and a conviction for escape from electronic monitoring. Though defendant claims that one warrant was the result of a faulty electronic monitoring box, he pled guilty to escape and was sentenced to two years of incarceration and one year of post release supervision. These factors alone show STEWART's high risk of non-appearance.

***COVID-19***

Beginning in 2021, the BOP began administering vaccines to staff members and inmates. On January 4, 2021, the BOP issued updated Covid-19 Vaccine Guidance, intended to provide direction on the promotion and use of the COVID-19 vaccine for all adults who meet the criteria established by the BOP, with guidance from the Advisory Committee on Immunization Practices (ACIP) and the CDC.[4] The BOP's stated goal is to "to promote vaccine use as a means of controlling pandemic transmission of SARS-CoV-2 (the virus that causes COVID-19) and reducing morbidity and mortality from this infection." *Id.*

As of July 19, 2021, the BOP reports that it has administered 202,205 doses of the COVID-19 vaccine, and that thousands of staff members and inmates are now fully inoculated.[5] Vaccination efforts are ongoing and the BOP's policy objective is to

---

[4] Bureau of Prisons, COVID-19 Vaccine Guidance, at 3 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (last visited July 5, 2021).
[5] COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ (last visited July 19, 2021).

make the vaccine available to all staff members and inmates who want to receive it as quickly as possible. *Id.*

In his motion, defendant mentioned his physical condition as part of the reason he should be released from custody. Dkt. 50 at 6-7. While the government does not contest that the defendant has asthma, the defendant's medical records call into question whether the condition is moderate or severe. When the defendant was evaluated at MCC on March 15, 2021, he reported that he had last used an inhaler a year prior, demonstrating that his asthma is not moderate to severe. *See* Exhibit STEWART Medical Record. In any event, the Center for Disease Control ("CDC") has stated that individuals with chronic lung disease, including moderate to severe asthma, are more likely to get severely ill from COVID-19.[6]

However, defendant's risk of COVID-19 infection is reduced by the fact that inmates and staff members at his facility are being vaccinated as part of the BOP's nationwide COVID-19 vaccination program. To date, at least 146 staff members and 514 inmates at defendant's current facility, Chicago MCC, are fully vaccinated.[7] Because Chicago MCC has approximately 571 inmates,[8] the vaccination rate for inmates is approximately 90% for this facility. Moreover, the BOP reports that Chicago MCC has zero inmates and one staff member with active COVID-19 cases, and 262 inmates and 72 staff members who have recovered from the virus.[9] These

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 19, 2021).
[7] https://www.bop.gov/coronavirus/index.jsp (last visited July 19, 2021).
[8] https://www.bop.gov/locations/institutions/ccc/ (last visited July 19, 2021).
[9] https://www.bop.gov/coronavirus/index.jsp (last visited July 19, 2021).

figures indicate that the efforts of BOP personnel to limit and control the spread of the virus to date have had a positive impact. Vaccines should help to further minimize the risk of infection.

## *Conclusion*

Based on the aforementioned reasons, defendant, Denzal STEWART's motion to reconsider detention should be denied.

        Respectfully submitted,

        JOHN R. LAUSCH, JR.
        United States Attorney

By:   */s/ Albert Berry III*
      ALBERT BERRY III
      Assistant United States Attorney
      219 S. Dearborn Street
      Chicago, Illinois 60604
      (312) 886-7855

Date: July 19, 2021