UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 21 CR 105 |
| | ) | Judge John Z. Lee |
| LAMAR TAYLOR | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT TAYLOR'S
MOTION FOR PRETRIAL RELEASE

The UNITED STATES OF AMERICA, through JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, hereby responds to
defendant LAMAR TAYLOR's motion for pretrial release, Dkt. 58, and states as
follows:

*Background*

On February 11, 2021, a federal grand jury indicted LAMAR TAYLOR and two
other individuals for arson, in violation of Title 18, United States Code, Section
844(f)(1) and (2). Dkt. 1. On February 24, 2021, LAMAR TAYLOR was arrested at his
home and brought before Magistrate Judge Weisman for an initial appearance and
arraignment. Dkt. 9. At that combined hearing, the government moved for detention
pursuant to Title 18, United States Code, Section 3142(f)(1)(A), in that the arson
committed was a crime of violence. The court set a detention hearing for February 26,
2021. *Id.* On February 26, 2021, the court held a detention hearing for TAYLOR and
his co-defendant, Denzal Stewart. With the consent of both defense counsel, the
government proceeded by way of proffer at the hearing.

*Prior Detention Hearing*

At the detention hearing, the government presented videos showing the arson of the unoccupied CTA van and a video posted to Facebook by TAYLOR showing, TAYLOR, Stewart, and TAYLOR's girlfriend driving towards downtown Chicago to "protest." After viewing the video and hearing argument from all parties, the court detained TAYLOR after finding him to be a risk of flight and a danger to the community. Dkts. 16, 30. In evaluating the statutory factors for detention, the court found that the nature and circumstances of the offense, the weight of the evidence, defendant's character – in particular the social media posting (described below) which showed a person not constrained by societal norms and demonstrated a disregard for compliance with the law, defendant's mental condition, defendant's history of alcohol and drug abuse, and the fact that defendant was on release for other charges at the time of the offense all weighed in favor of detention. *Id.*

### *Instant Motion*

Defendant now brings a motion seeking reconsideration of Magistrate Weisman's decision to detain him. In his motion, TAYLOR does not contest the findings by Magistrate Judge Weisman but seeks to add context for the defendant's behavior. Additionally, TAYLOR proposes his brother, instead of his girlfriend, as a third-party custodian. The context TAYLOR provides the court and the proposal of his brother as a third-party custodian are not persuasive and should be rejected by this court. Magistrate Judge Weisman was correct in finding TAYLOR to be a danger to the community and a risk of flight and this court should find the same.

### *Nature and Circumstances of the Offense and Weight of the Evidence*

On May 30, 2020, TAYLOR, along with Denzal Stewart and Darion Lindsey, lit an unoccupied CTA van on fire during the protests that were taking place in downtown Chicago after the murder of George Floyd in Minneapolis. In an effort to excuse his abhorrent behavior on May 30, 2020, the defendant claims that the impact of being shot and witnessing his brother being shot by members of the Chicago Police Department resulted in untreated Post Traumatic Stress Disorder (PTSD) and should be considered "as an explanation for [his] alleged conduct on the date in question as being triggered by the effect of the George Floyd murder on his memory of the killing of his brother by the Chicago Police." Dkt. 58 at 8. However, TAYLOR's Facebook posting while he was on his way downtown to "protest" paints an entirely different picture. It does not show a person wrought with PTSD over the memory of his brother's death. It does not show a person that was headed downtown to express his frustration with the Chicago Police Department or the criminal justice system. It shows an individual – TAYLOR – that was determined to cause havoc and reap any sort of benefit for himself, no matter the consequences.

*Facebook Live Video – Budda Ball on my way Downtown*

At the beginning of a video titled, "Budda Ball on my way downtown,"[1] TAYLOR can be seen sitting in the front passenger seat of a vehicle, with Stewart sitting in the back-passenger seat. TAYLOR was wearing an orange Detroit Tigers shirt, with a blue long-sleeved shirt underneath, a Baltimore Orioles cap, plastic

---

[1] The government will file the video "Budda Ball on my way downtown" as a video exhibit to this motion.

gloves, and a black ski mask covering his face. Stewart was in the back seat with a white tank top and is seen putting plastic gloves on his hands.

Early in the video, TAYLOR stated, "We fittin' to go down here to get busy, like everybody else," and followed up saying to Stewart, "Cuz we about to go down here and get buckwild like everyone else." Steward replied, "You hear me." TAYLOR stated, "I'm tryin' to hit a lick. No justice, no peace [expletive]. No justice." Stewart continued the statement, "No [expletive] peace.

Later in the video, TAYLOR stated, "I'm trying to get down like everybody else. I'm trying to get that $50,000 Rolex" and get himself some "free [stuff]." TAYLOR bragged on the camera, "I'll be the one to throw a brick through that [expletive]." He then invited others to come downtown to "get some of this free [stuff]." He continued to talk about getting stuff by stating that he didn't want shoes but wanted a Rolex or to "hit a bank or something," which he quickly acknowledged was unlikely.

About four minutes and twenty seconds into the video, TAYLOR took off his mask and acknowledged, "I'm really going down here for the bull[expletive] too though." He followed that up by saying he was on his way downtown to "protest," while making air quotes with his left hand. In case anyone had any doubt as to where TAYLOR was headed, he flipped the cellular phone camera and showed the car on the expressway heading towards downtown Chicago.

At approximately the sixteen minute and forty-five second mark of the video, TAYLOR, seemingly in answering a question from Facebook Live, again turned the cellular phone camera around to show the people watching the expressway.

Immediately after, he looked into the camera and stated, "We on our way to protest," while making air quotes with both of his hands. TAYLOR continued, "but I'm trying to get me a Rolex [laughter]. I'm on my way to protest for a Rolex." TAYLOR ended the video by showing those that were watching that he had a bunch of plastic gloves and a ski mask. While showing the ski mask, TAYLOR stated, "We come down here ready to catch a [expletive] case. I don't give no [expletive]."

Only once did TAYLOR make any mention of his brother being shot by the Chicago Police Department – when there was less than 30 seconds left in the video. Even then, it wasn't to declare that he was going to protest over the shooting of his brother and its possible connection to the murder of George Floyd. It was to inform those watching that he "don't give no [expletive]." The video clearly shows the reason why TAYLOR was headed to downtown Chicago. In fact, TAYLOR told everyone – to cause havoc by "catching a lick," "trying to act an ass," and being there "for the bull[expletive]." To now claim that it was because of some unresolved PTSD from his brother's death is disingenuous and outright shameful.

***Compilation of video from Downtown Chicago on May 30, 2020***

Additionally, the arson of the CTA van was captured on video.[2] That video showed TAYLOR and Stewart setting a CTA van on fire wearing the same clothes as the video mentioned above. Some stills from the video are below:

---

[2] The government can provide the court with the video ahead of the hearing and can play the video at the hearing. The video requires Genetec Video Player to view.



STEWART                                                    Small Flame

In the picture above Stewart is lighting a fire in the back of the CTA van.



STEWART              TAYLOR              Fire

In the picture above, TAYLOR is inside the front passenger compartment of the van. While in there, a flash of fire is seen. Stewart is standing behind TAYLOR watching him.



STEWART                                    TAYLOR.

The above picture comes after TAYLOR was in the front passenger compartment of the van. After the fire is seen (picture above this one), TAYLOR exits the van and runs around the van, closing all the doors.



STEWART

In the picture above, Stewart is about to put a cardboard box, that he found on

the ground, into the front passenger compartment of the CTA van.





The two pictures above show the CTA van on fire. The first picture is when the flames first appeared. The second picture shows people walking by the van on fire.



The picture above is after approximately eight minutes of the CTA van burning. Firemen came to the scene to put out the fire. The CTA van is destroyed.

TAYLOR, along with Stewart and Lindsey, committed arson, which is a crime of violence, during a time where there were a lot of people on the streets of downtown Chicago. By setting that gasoline fueled van on fire, they risked the safety and well being of people that were standing around watching it burn, any potential people in stores or buildings around the area, and the safety of the firemen that had to put out the fire. The fire lasted approximately eight minutes and there were bursts of flame that extended from the van, even while the firefighters were trying to put out the fire. This behavior shows defendant's dangerousness to the community. Fires in urban areas with buildings nearby carry an "inherent danger of injury to other persons." *United States v. Hicks*, 106 F.3d 187, 191–92 (7th Cir. 1997).

### *History and Characteristics of TAYLOR*

Though TAYLOR does not have any adult convictions, his criminal history shows that he is both a danger to the community and a risk of flight. The pretrial report reflects the behavior of a person that has no respect for others, including the Chicago Police Department. The report details an arrest in 2020 where TAYLOR flashed gang signs at officers and ran and another arrest in 2020 where TAYLOR advanced towards officers in an aggressive manner threatening to harm them physically. TAYLOR's juvenile history shows a person that has been involved in a litany of offenses, some property and some violent.

### *Risk of Non-Appearance or Flight*

During 2020, TAYLOR was arrested four separate times. In three of the four

cases, TAYLOR missed court and a warrant had to be issued for his arrest, including

one case where the defendant failed to appear in court on *seven* consecutive dates.

Even though the court gave TAYLOR multiple chances by releasing him after being

arrested on the warrants, TAYLOR still refused the court's order and failed to appear

in court. His behavior has resulted in him having three active warrants currently

outstanding for his arrest for failure to appear in court.

In this case, TAYLOR has more incentive to flee or not appear in court. He is

facing a federal charge with a mandatory five year minimum, not merely

misdemeanor offenses. In regards to appearing for court, TAYLOR's previous history

is predictive of his future behavior in this case. If released, TAYLOR will do as he has

always done – not appear.

The proposal of TAYLOR's brother as a third party custodian does not alleviate

the concern regarding TAYLOR's dangerousness and failure to appear in court nor

does it alleviate the concern voiced by Magistrate Weisman. In his order, Magistrate

Weisman stated that defendant's girlfriend was not a suitable third-party custodian

partly because "[i]f she has not been able to positively influence Defendant, then she

would not be a suitable third-party custodian." Dkt. 30 at 4. The same holds true for

TAYLOR's brother.

### *Danger to Others in Community*

TAYLOR argues that he is not a danger to the community because he has

unresolved PTSD that simply manifested itself after the murder of George Floyd by

police officers in Minneapolis and because he has a three-year-old son. The court should reject this argument and find as Magistrate Weisman did, that the defendant is a danger to the community.

On May 30, 2020, TAYLOR left his two or three-year-old son to go to downtown Chicago "for the bull[expletive]" and "ready to catch a [expletive] case." He left his son with the idea that he was going to get some "free [stuff]" by throwing bricks through windows and running from the police. He left his son with the intention to create mischief and cause havoc. His actions on May 30, 2020 show that having a son does not deter Lamar TAYLOR from being a danger to the community.

It appears that TAYLOR's argument is that had Magistrate Judge Weisman known that TAYLOR witnessed his brother shot and killed by members of the Chicago Police Department rather than the death of a friend, the outcome may have been different. The argument is that this incident is an "explanation" for TAYLOR's alleged conduct. It isn't.

The videos showed at the detention hearing showed TAYLOR talking about throwing bricks through windows and trying to loot stores all while making light of legitimate protests of the murder of George Floyd, showed TAYLOR kicking Divvy bikes while they were locked in the stand in an attempt to free one without paying, and showed TAYLOR setting fire to a CTA van. The videos showed that TAYLOR is a danger to the community.

***Conclusion***

Based on the aforementioned reasons, defendant, Lamar TAYLOR's motion for
pretrial release should be denied.


                                    Respectfully submitted,

                                    JOHN R. LAUSCH, JR.
                                    United States Attorney

                          By:    /s/ Albert Berry III
                                    ALBERT BERRY III
                                    Assistant United States Attorney
                                    219 S. Dearborn Street
                                    Chicago, Illinois 60604
                                    (312) 886-7855

Date: July 19, 2021