IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


UNITED STATES OF AMERICA,              )   Docket No. 21 CR 105
                                       )
                     Plaintiff,        )
                                       )
              vs.                      )
                                       )
DENZAL STEWART and LAMAR TAYLOR,       )   Chicago, Illinois
                                       )   February 26, 2021
                     Defendants.       )   10:38 o'clock a.m.


       TRANSCRIPT OF TELEPHONIC PROCEEDINGS - DETENTION HEARING
        BEFORE THE HONORABLE MAGISTRATE JUDGE M. DAVID WEISMAN


APPEARANCES:

For the Plaintiff          HON. JOHN R. LAUSCH, JR.
Via Telephone:             United States Attorney
                           BY:  MR. ALBERT BERRY, III
                           219 S. Dearborn St., Suite 500
                           Chicago, Illinois  60604

For the Defendant          LAW OFFICE OF STEVEN R. HUNTER
Stewart Via Telephone:     BY:  MR. STEVEN R. HUNTER
                           900 W. Jackson Blvd., Suite 7 East
                           Chicago, Illinois  60607

For the Defendant          SASSAN & SASSAN
Taylor Via Telephone:      BY:  MR. ANTHONY J. SASSAN
                           161 N. Clark Street
                           Chicago, Illinois  60601

Also Present Via
Telephone:                 MS. JUDITH LESCH, Pretrial Services

Court Reporter:            MS. JOENE HANHARDT
                           Official Court Reporter
                           219 S. Dearborn Street, Suite 1744-A
                           Chicago, Illinois  60604
                           (312) 435-6874
              * * * * * * * * * * * * * * * *
                   PROCEEDINGS RECORDED BY
                   MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY COMPUTER

1          THE CLERK:  21 CR 105-1, USA vs. Denzal Stewart, and

2   21 CR 105-2, USA vs. Lamar Taylor.

3          THE COURT:  Good morning.

4          For the United States?

5          MR. BERRY (Via Telephone):  Good morning, everyone,

6   Albert Berry -- B, as in "Boy," e-r-r-y -- for the United

7   States.

8          THE COURT:  Good morning, Mr. Berry.

9          MR. BERRY (Via Telephone):  Good morning.

10          THE COURT:  For Mr. Stewart?

11          MR. HUNTER (Via Telephone):  Good morning, Judge,

12   Steven Hunter on behalf of Denzal Stewart.

13          THE COURT:  Good morning, Mr. Hunter.

14          Mr. Stewart, are you on the line, sir?

15          THE DEFENDANT STEWART (Via Telephone):  Yes, sir.

16   Good morning.

17          THE COURT:  Good morning.

18          For Mr. Taylor?

19          MR. SASSAN (Via Telephone):  Good morning, your Honor,

20   Tony Sassan -- S-a-s-s-a-n -- on behalf of Lamar Taylor.

21          I understand Mr. Taylor is on the line, as well.

22          THE COURT:  Good morning, Mr. Sassan.

23          Good morning, Mr. Taylor.

24          THE DEFENDANT TAYLOR (Via Telephone):  Good morning,

25   your Honor.

1    THE COURT:  All right.  We are here for a detention

2  hearing.

3    Mr. Stewart and Mr. Taylor, it is my understanding you

4  are willing to proceed with this hearing telephonically.

5    Is that correct, Mr. Stewart?

6    THE DEFENDANT STEWART (Via Telephone):  Yes.

7    THE COURT:  Mr. Taylor, is that correct?

8    THE DEFENDANT TAYLOR (Via Telephone):  Yes.

9    THE COURT:  All right.

10    Mr. Berry, where does the government stand on

11  detention?

12    MR. BERRY (Via Telephone):  Your Honor, as to both Mr.

13  Stewart and Mr. Taylor, the government is seeking detention

14  based off of risk of flight and risk of danger to the

15  community.

16    THE COURT:  All right.

17    And I am sorry, is there a representative from

18  Pretrial Services on the line?

19    PRETRIAL SERVICES OFFICER (Via Telephone):  Yes, your

20  Honor, good morning, Judith Lesch on behalf of Pretrial

21  Services.

22    THE COURT:  Good morning, Ms. Lesch.  Thank you for

23  being here.

24    All right.  Mr. Berry, I interrupted you.  So, danger

25  to the community and risk of flight.  Those are the two bases

1    that you are proceeding on; is that correct?

2          MR. BERRY (Via Telephone):  Yes, your Honor.

3          THE COURT:  All right.

4          And what is your proposal?  Do you want to present

5    evidence as to Mr. Stewart and, then, Mr. Taylor?

6          Do you want to do a joint presentation and, then, an

7    individual presentation?

8          I know you have provided the Court with a video.  I am

9    thinking that may be better presented jointly and, then,

10    discuss the 3142 factors individually.

11          MR. BERRY (Via Telephone):  That is correct, your

12    Honor.  That was my plan, in order to proceed today.

13          THE COURT:  All right.

14          So, Mr. Berry, have you provided the video disk that

15    you gave the Court to defense counsel?

16          MR. BERRY (Via Telephone):  I have, your Honor.  I

17    have provided the three videos and the player to defense

18    counsel, via the U.S.A. FX Exchange, the day before yesterday.

19          THE COURT:  All right.

20          Mr. Hunter, do you acknowledge receipt and access to

21    that information?

22          MR. HUNTER (Via Telephone):  Yes, Judge.

23          One thing, though.  I received four videos.  So, if he

24    is only presenting three, could he identify which three?

25          THE COURT:  Sure.  All right.

1          MR. BERRY (Via Telephone):  I apologize for that.  The

2  three videos, the one is called Buddaball On My Way Downtown.

3  That is B-u-d-d-a, for Buddaball.

4          The others are one -- the videos of the fire, one --

5  from Pritzker Park East and the other down State Street.

6          There was a small video -- there was a video that

7  showed something else.  And I am not presenting that, Mr.

8  Hunter.

9          MR. HUNTER (Via Telephone):  Thank you.

10          THE COURT:  All right.

11          Mr. Sassan, do you acknowledge receipt of and access

12  to the video information Mr. Berry just described?

13          MR. SASSAN (Via Telephone):  Your Honor, I am actually

14  trying to find it --

15          THE COURT:  Well, take your time.  I want you to have

16  access to it.

17          MR. SASSAN (Via Telephone):  -- in the e-mail that I

18  have.

19          (Brief pause.)

20          MR. SASSAN (Via Telephone):  Your Honor, I apologize.

21  Could I ask Mr. Berry to resend that link?

22          I have been able to find at least one of the other

23  videos through a different source, but I apologize and I can't

24  find the e-mail with the link to the -- you know, to the -- the

25  U.S drop box that --

1            THE COURT:  All right.

2            Mr. Berry, can you resend that?

3            And the second question, if you can, how long will it

4    take for Mr. Sassan to load the software necessary to view the

5    video?

6            MR. BERRY (Via Telephone):  I will resend that right

7    now.

8            I got an e-mail saying that he had accepted the

9    invite.  So, let me just resend it.

10           THE COURT:  And how much time will be involved, Mr.

11   Berry?

12           We have a court reporter on and we don't need to have

13   all of this on the record if there is going to be, you know, a

14   chunk of time to get everyone orientated.

15           MR. BERRY (Via Telephone):  It might -- the video --

16   the player, itself, can be a little finicky, your Honor, as you

17   know.

18           THE COURT:  Okay.

19           MR. BERRY (Via Telephone):  But it may take --

20           THE COURT:  So, here is what we are --

21           Yes, thank you, Mr. Berry.

22           Here is what we are going to do.  We will take a brief

23   recess.

24           Mr. Berry, please send that over.

25           Mr. Sassan -- everyone stay on the line, but,

1    Mr. Sassan, once you receive it and you load the software, I

2    don't know how it is going to interface with your computer;

3    but, once it is ready to go, so you can access it, just let us

4    know and we will go back on the record.

5           But Mr. Stewart and Mr. Taylor, if you can indulge us

6    so that Mr. Sassan has access to this information, we are going

7    to need a few minutes.

8           And I know the Lockup -- or I don't know if we're at

9    the MCC -- but people there, I apologize for the delay.  But we

10   need to get everyone with access to this.

11          So, Mr. Berry and Mr. Sassan will be in the courtroom.

12   We will be hearing you.  Just tell us when you are ready to go.

13          And, then, if the court reporter, you don't need to

14   put this in-between exchange on the record, since we are just

15   waiting.

16          MR. HUNTER (Via Telephone):  Judge, could I -- I am

17   sorry.

18          MR. BERRY (Via Telephone):  I just sent the link.

19          THE COURT:  Thank you, Mr. Berry.

20          Mr. Hunter?

21          MR. HUNTER (Via Telephone):  Yes, Judge, Steve Hunter

22   on behalf of Mr. Stewart.

23          Judge, I have got my player opened and the way it

24   works is I have to drag whichever video over to it and get it

25   going.

1          So, would it be possible for Mr. Berry to let us know

2    which one he is going to use first, so I can queue it up?

3          THE COURT:  Brilliant.

4          Mr. Berry?

5          MR. BERRY (Via Telephone):  I will start with the

6    video on State Street.  So, that is the second one.

7          MR. HUNTER (Via Telephone):  Thank you.

8          MR. BERRY (Via Telephone):  It is at 69:82.

9          MR. HUNTER (Via Telephone):  Right.  Got it.

10          THE COURT:  All right.

11          We are going to go off the record now and, then, we

12    will jump back on once Mr. Sassan is ready to go.

13          Thank you.

14          MR. BERRY (Via Telephone):  Thank you.

15          MR. HUNTER (Via Telephone):  Thank you, your Honor.  I

16    apologize.

17          (Brief recess.)

18          (Whereupon, the Court gave its attention to other

19      matters, after which the following further proceedings were

20      had in open court, to wit:)

21          THE CLERK:  Recalling 21 CR 105-1, USA vs. Denzal

22    Stewart, and 21 CR 105-2, USA vs. Lamar Taylor.

23          THE COURT:  All right.  We are back on the record.

24          Mr. Sassan, do you have access to the video

25    information that Mr. Berry may be presenting to the Court?

1          MR. BERRY (Via Telephone):  I think now he can only

2    hear me through my phone, your Honor.

3          Mr. Sassan, the Judge is speaking.

4          MR. SASSAN (Via Telephone):  Yes, I can only hear

5    through your phone.

6          MR. BERRY (Via Telephone):  Okay.

7          THE COURT REPORTER:  I am sorry, I cannot hear Mr.

8    Sassan.

9          THE COURT:  Thank you.

10          Mr. Berry, can you explain to me what is going on

11    because we are going to have trouble hearing Mr. Sassan.

12          MR. BERRY (Via Telephone):  Sure.

13          Mr. Sassan, are you on a different line or were you

14    calling in from your cell phone?

15          MR. SASSAN (Via Telephone):  I have been calling in on

16    my cell phone.

17          I am now only on your line now.

18          MR. BERRY (Via Telephone):  Do you not have another --

19    you don't have another phone to call in on or should I try to

20    get you through WebEx?

21          MR. SASSAN (Via Telephone):  I don't have another

22    phone to call in on.

23          MR. BERRY (Via Telephone):  Okay.

24          So, this work around, your Honor, you thought Mr.

25    Sassan was giving me a separate number.  I am on his cell phone

 1    through FaceTime and, therefore, he got cut off of your line

 2    with the Court.

 3           So, now, what I think I will probably have to try to

 4    do is invite him through a WebEx.  And, then, maybe I will try

 5    to share my screen there and see if that would work.

 6           But he can call back into the court -- hear through

 7    the court.  Otherwise, he can hear you through my speaker, but

 8    the court reporter can't hear him.

 9           MR. SASSAN (Via Telephone):  I can hear everyone else,

10    your Honor, including the court reporter.  Am I still not being

11    heard?

12           THE COURT:  All right.  Hold on.

13           Joene, can you hear Mr. Sassan sufficiently to record

14    him?

15           THE CLERK:  Very vaguely, Judge.

16           THE COURT:  What is your preference?

17           I am sorry, hold on, Mr. Sassan.

18           What is your preference?  Do you want to try to work

19    around or do you want to see if we can proceed under the

20    circumstances presented?

21           THE COURT REPORTER:  Judge, I think we can try to

22    proceed.  I will interrupt if I cannot hear him.

23           If he can try to talk louder, it will come across.

24           THE COURT:  All right.

25           MR. SASSAN (Via Telephone):  I will talk as loud as I

1    can, your Honor.

2             THE COURT REPORTER:  Oh, that is much better, Judge.

3             THE COURT:  All right.

4             So, we need to speak loudly.

5             We also need to be hypersensitive to not interrupting

6    each other.

7             All right.  So, we are -- to re-orientate ourselves,

8    we are -- here for a detention hearing.

9             Mr. Stewart and Mr. Taylor are present on the line.

10            Mr. Hunter is representing Mr. Stewart.

11            And Mr. Sassan is with Mr. Taylor.

12            Mr. Berry, it is the government's motion for

13   detention.  I will let you begin with general information

14   related to the nature and circumstances of the offense.

15            We will then proceed to the 3142(f) factors, beyond

16   that factor, as it relates to each individual defendant.

17            And, at that point, maybe Mr. Sassan can jump off of

18   FaceTime and call in, since we won't need access to the video.

19            Mr. Berry, please continue.

20            MR. BERRY (Via Telephone):  Thank you, your Honor.

21            I -- the government's position is that both defendants

22   are a danger to the community and a risk of non- --  there is a

23   high risk of non- -- appearance in this case.

24            Both defendants have been charged with an arson of a

25   CTA van that took place back on May 30th of 2020.

1          The government has two -- well, there are three

2    videos.  The government is going to play two and talk about the

3    third video.

4          Both counsel have seen the video.  They are about to

5    see the arson.  And they have seen a Facebook video that comes

6    from Mr. Lamar Taylor's Facebook account of them on their way

7    downtown.

8          The arson, itself, I will start with the video 69:82,

9    which is from a video from 351 South State Street.

10          That video focuses in on the CTA van, itself.

11          And where I want to start is -- and I will play it up

12    to a certain point.  So, I will play about four minutes of it,

13    your Honor.

14          I want to start at seven minutes and 38 -- 7:38 and 30

15    seconds.

16          I will try to coordinate this, so that everybody is

17    kind of in the same spot.

18          And I understand it may be a little off, but about

19    seven minutes -- excuse me, 7:38 and thirty seconds -- it is a

20    -- I have paused it at this point.  It is a picture of the CTA

21    van with the back of the van open.

22          Mr. Denzal Stewart is standing there with a white

23    T-shirt, a tank top, his hat turned backwards, and in some blue

24    jean pants.

25          He is going to approach the back of the van and I will

1    play it from there.

2              You can see Mr. Stewart.  He has -- his pants are

3    sagging and he has -- kind of blue underwear that is showing.

4              There is a bunch of individuals that go to the van and

5    they start to throw things out of the van.

6              Mr. Stewart runs away and the van is left, kind of,

7    open for a while.

8              (Brief pause.)

9              MR. BERRY (Via Telephone):  And I am pausing as the

10   people are walking past the van.  And parts of the van are

11   open.

12             And individuals are approaching now.  Not Mr. Stewart

13   or Mr. Taylor.

14             They are going inside the van and they are taking

15   things out of the van.

16             Mr. Stewart -- Mr. Denzal Stewart -- approaches.  He

17   picks up something.  It looks like the thing that workers use

18   to pick up garbage.

19             And at this point, he is trying to set a fire to the

20   back of the van.

21             MR. HUNTER (Via Telephone):  Could you pause one

22   moment for my video to catch up?  I am about thirty seconds

23   behind you.

24             MR. BERRY (Via Telephone):  Sure.

25             (Brief pause.)

1      MR. BERRY (Via Telephone):  So, where I am, I am at

2  7:39 and 35 seconds.

3      MR. HUNTER (Via Telephone):  Okay.  That is where I

4  am.

5      MR. BERRY (Via Telephone):  There is a slight flame

6  that you can see inside the van.

7      Mr. Stewart is about to walk away.

8      I will hit "Play."

9      At this point, Mr. Stewart is going up.

10      And here comes Mr. Taylor in an orange Detroit Tigers

11  T-shirt.  And there, by the front door -- front open driver's

12  side door of the van -- and they stay there for some time.  And

13  that is when the -- and we will go back to the Pritzker Park

14  view, facing east, shows what is happening in the front door of

15  that van.

16      Another individual, who we expect will be charged,

17  comes and he attempts to light the box that is on the ground.

18      THE COURT:  Mr. Berry, that is the gentleman in the

19  pink hat?

20      MR. BERRY (Via Telephone):  That's correct, your Honor.

21      THE COURT:  Okay.

22      MR. BERRY (Via Telephone):  And he is attempting now

23  to light the yellow tarp that is in the back of the van.

24      That is the gentleman in the pink hat, yes, sir.  And

25  that is Mr. Lindsey.

1          Mr. Lindsey takes the fire extinguisher out.

2          Mr. Taylor gets out of the van and starts closing all

3     of the doors.

4          At this point, we will see on the Pritzker Park East

5     camera, you have got a slight flame that had engulfed -- had

6     ignited -- in the front of the van.

7          THE COURT:  And we will see that in the other video;

8     is that right?

9          MR. BERRY (Via Telephone):  That is correct, your

10    Honor.

11         THE COURT:  Okay.

12         MR. BERRY (Via Telephone):  Mr. Lindsey peeks in the

13    van, closes it and you can see the fire extinguisher in his

14    hand.

15         Mr. Taylor takes some debris out, throws it to the

16    ground.

17         Mr. Stewart runs away from the van.

18         At about 7:42 and 17 seconds, you will see Mr. Stewart

19    come back over and pick up that brown box that is on the ground

20    by the van and placed it in the driver's door.

21         Here he comes.  He takes the box and puts it inside

22    the driver's door and closes the door and leaves.

23         At about 7:42 and 57 seconds, you will see smoke from

24    the CTA van.

25         An individual, who is Mr. Stewart, he has a mask on

1  his face this time, the same clothing, approaches the van and

2  throws something else inside.

3          Here he comes.  He picks up something.

4          There is smoke coming out of the van at this point.

5          He puts something else in and runs.

6          There is a woman that is recording.

7          You can see the smoke from the van and in a few

8  seconds the van will go up in flames.

9          I am at 7:43 and 40 seconds and some flames are coming

10  out of the window.

11          And flames are coming out of the side of the van at

12  7:43 and 55 seconds.

13          And the rest of the video just continues along with

14  the van burning and the Fire Department coming to exterminate

15  the flames.

16          And it shows kind of the results when you get to the

17  end of the video of the van being completely burned down.

18          So, that the arson in regards to that video, your

19  Honor.

20          THE COURT:  All right.

21          MR. BERRY (Via Telephone):  If I may move the second

22  video?

23          THE COURT:  Yes, give me a second.  I have got to get

24  that one on.

25          (Brief pause.)

```
 1              MR. SASSAN (Via Telephone):  I do, too, Judge.
 2              MR. BERRY (Via Telephone):  And I understand.
 3              (Brief pause.)
 4              THE COURT:  So, Mr. Berry, how do I get rid of -- oh,
 5    you told me just to bring in that other folder, right?
 6              MR. BERRY (Via Telephone):  Yes, sir.
 7              THE COURT:  Okay.
 8              MR. BERRY (Via Telephone):  And it should replace it.
 9              THE COURT:  And that is the Pritzker Park view; is
10    that correct?
11              MR. BERRY (Via Telephone):  Yes, sir.
12              THE COURT:  Okay.
13              Mr. Hunter --
14              Give me a minute.
15              MR. BERRY (Via Telephone):  I am going to start there.
16              THE COURT:  Give me a minute.
17              Mr. Hunter, are you ready with that one?
18              MR. HUNTER (Via Telephone):  Not quite yet.  It says,
19    "Initializing."  So, I am hoping it will pop up shortly.
20              THE COURT:  Okay.  Tell us when you are ready.
21              Mr. Sassan, were you able to view, through the
22    technology workaround we have set up, what Mr. Berry described?
23              MR. SASSAN (Via Telephone):  Yes, your Honor.  I am
24    able to see it fine.
25              Thank you.
```

1          THE COURT:  Thank you.

2          Mr. Hunter --

3          MR. HUNTER (Via Telephone):  Judge, my video is now

4     up.

5          THE COURT:  Perfect.

6          Mr. Berry, please proceed.

7          MR. BERRY (Via Telephone):  Yes, sir.

8          So, I am going to go -- I am going to start -- at

9     about seven minutes -- excuse me.  I keep saying, "Seven

10    minutes" -- 7:31, so we can get to there.

11         THE COURT:  All right.  7:31 even, correct?

12         MR. BERRY (Via Telephone):  Yes, your Honor.

13         A little bit beyond 7:31 even.

14         THE COURT:  Tell me when you are ready.

15         Mr. Hunter, are you ready?

16         MR. HUNTER (Via Telephone):  I am ready, Judge.

17         THE COURT:  All right.

18         Go ahead, Mr. Berry.

19         MR. BERRY (Via Telephone):  Thank you, your Honor.

20         So, from about 7:31 even, you see a bunch of

21    individuals over kicking out the Divvy bikes.

22         And understanding that this is a pre-arson -- before

23    the arson -- but I think it goes to the defendant's

24    characteristics.

25         Mr. Stewart comes over.  Mr. Taylor comes over.  And

1    you will see them kicking at the Divvy bikes, trying to get

2    them out of their station, trying to get a free bike.

3            Mr. Stewart eventually gets a bike out and they give

4    it to a woman that they are with.

5            At about 7:31:41, Mr. Stewart gets a bike.  He is

6    about to get on it.  Mr. Taylor comes over, takes the bike,

7    hands it off to a woman that they are with and they proceed

8    about their way, continuing to try to get other Divvy bikes.

9            They -- Mr. Stewart and Mr. Taylor -- don't get

10   another Divvy bike.  So, I am going to pause.  I am going to

11   move forward, again, if I may, to about 7:40 -- exactly, 7:40.

12           THE COURT:  Mr. Hunter, tell me when you are at 7:40.

13           MR. HUNTER (Via Telephone):  I am there, Judge.

14           THE COURT:  Okay.

15           Mr. Berry, proceed.

16           MR. BERRY (Via Telephone):  Thank you, your Honor.

17           When we are at 7:40, it is a little tougher to see,

18   but at this point Mr. Taylor, you can see his back by the

19   driver's side door of the van.  And Mr. Stewart is in front of

20   him.

21           They are inside the driver's door of the van.

22           They walk away and, then, they go back.

23           As they go back to it, something is happening in the

24   front of the van.  They both jump -- they both are going to

25   jump -- and, then, go back.  And, then, you will see a flame in

1  the front of the van spark.

2          And I will -- understanding that the Court doesn't

3  have where I am pausing, I will -- go back and I will call out

4  the time on where I have paused, where you can see the flames

5  from inside the van coming to light.

6          Give me one second.

7          (Brief pause.)

8          MR. BERRY (Via Telephone):  So, when I pause, it is

9  about 7:40 and 32 seconds -- .204 milliseconds.  You can see

10  there is a flame coming out of the front door of the van, where

11  Mr. Stewart and Mr. Taylor are.

12          MR. SASSAN (Via Telephone):  I am sorry.  Could I have

13  that time, again?

14          MR. BERRY (Via Telephone):  Sure.  7:40:32.24.

15          MR. SASSAN (Via Telephone):  If I could have a moment

16  to get there?

17          MR. BERRY (Via Telephone):  And if you pause --

18          THE COURT:  Hold on.  Give me a moment to 7:40:32,

19  right?

20          MR. BERRY (Via Telephone):  Yes.

21          And if you pause it, you can go frame by frame by

22  hitting the back button.

23          THE COURT:  Hitting the back button or the forward?

24          MR. BERRY (Via Telephone):  Depending on which

25  direction you want to go, you can go frame by frame backward or

1  frame by frame forward.

2          THE COURT:  Okay.

3          Wait, let me get to 7:40:32.

4          MR. BERRY (Via Telephone):  And, then, you can move

5  slowly through and see the flames.

6          It is at its height at 7:40:32.17.

7          (Brief pause.)

8          THE COURT:  Okay.

9          MR. BERRY (Via Telephone):  Are you okay?

10          THE COURT:  Mr. Hunter, are you are with us?

11          MR. HUNTER (Via Telephone):  I am, Judge.

12          THE COURT:  Okay.

13          Go ahead, Mr. Berry.

14          MR. BERRY (Via Telephone):  And with those videos --

15  those are the two videos, your Honor, that show the fire --

16  show who set the fire.

17          You can see the fire.  As you go through -- and I

18  won't do it here, but you can go through -- the continuation of

19  the video and they show the same.  They show the van being set

20  on fire, the van being engulfed in flames, and that van is

21  totally destroyed.  And it is by Mr. Taylor, Mr. Stewart and

22  Mr. Lindsey.

23          THE COURT:  All right.

24          MR. BERRY (Via Telephone):  Now, there was a third

25  video that the government presented.  And that video was --

1    that the government gave to all parties; and, I believe, all of

2    the parties have viewed the video.  That is video from Mr.

3    Lamar Taylor's Facebook page.  It is titled, "Buddaball On His

4    Way Downtown."

5           "Budda" is spelled B-u-d-d-a.

6           In that video, Mr. Taylor is in the front seat wearing

7    the same clothing as the individual that sets the fire.  And

8    Mr. Stewart is in the back seat wearing the white tank top and

9    a hat.

10          When the video first comes on, Mr. Taylor is wearing a

11   mask and he is wearing some plastic gloves.

12          And Mr. Stewart is in the back.

13          Mr. Taylor eventually takes his mask off.  So, we know

14   it is him.

15          And Mr. Taylor -- Mr. Stewart -- his face is very

16   visible in the camera.  We know that is him, also.

17          Additionally, Mr. Taylor calls the person in the

18   backseat "Denzal" at least, from my count, about seven times

19   throughout this.

20          The reason we present this, your Honor, is that as

21   part of the charge is that the defendants maliciously caused

22   this fire.  And I don't think this is outside of the bounds of

23   that day.

24          That day, there was a protest going on that day, and

25   it can be seen in the video that there are many people that are

1    downtown protesting.

2          These defendants didn't come downtown to protest.

3    Their video clearly states that.

4          Mr. Taylor is on FaceTime talking to, I don't know,

5    how many followers, but as many people as he possibly can.  And

6    he said -- and I will quote -- "I'm setting to go down here and

7    get busy, like everyone else.  I'm just trying to hit a lick.

8    I'm trying to get down, like everybody else.  I'm trying to get

9    that $50,000 Rolex.  I'm going to be the one to throw a brick

10   through that bitch.  We in there."

11         He said, you know, to his cousin in the back, "I got

12   my girl driving.  You ready, ain't you?"

13         And she says, "Yeah, yeah," she's ready.

14         And it is my position that that girlfriend is Ms. Lee,

15   who is his proposed third-party custodian.

16         He says, "You all come down there.  Get some of this

17   free shit.  I'm really going down there for the bullshit.  I'm

18   going to be on video doing some shit, 12, so the police are

19   going to pull up right to my crib."

20         MR. HUNTER (Via Telephone):  Judge, I would object to

21   any of these statements being considered for Mr. Stewart.  This

22   was all Mr. Taylor's words.

23         MR. BERRY (Via Telephone):  Understood.  And I am not

24   proposing that that is Mr. Stewart that is saying this.  Mr.

25   Taylor is saying it.

1          And in the background, there are times throughout the

2    video where Mr. Stewart is saying, "Yeah, yeah, yeah."

3          And I will get to some of the words that Mr. Stewart

4    says in a minute.

5          Mr. Taylor also says, "I'm on my way downtown to go

6    protest."

7          So, when he does that, he makes it -- he makes it --

8    known that he is not really going to protest, as he puts his

9    fingers up for air quotes to let everybody know he is going

10   down there to protest.

11         He shows his face.  He shows that he is on his way

12   downtown to film the same day.

13         He tells his cousin in the back, "Denzal, I'm telling

14   you don't stop running."

15         Mr. Stewart says, "I already know."

16         They talk about how to get there.

17         Mr. Taylor says, "Taking Lake Shore Drive will bring

18   us by all those stores.  That's all I give a fuck about."

19         Mr. Stewart is in the back.  He says, "I'm trying to

20   hit a jewelry store."

21         Mr. Taylor says, "I'm going to hit anything they got

22   open, Burberry or anything."

23         At least two times he says he's going to protest with

24   the air quotes.

25         And Mr. Stewart -- Mr. Taylor -- says that he is going

1    down there to, "act and ask."

2            He also says, you know, "came down with gloves and

3    masks."

4            And he said, "I came down -- we came down -- we came

5    down here ready to catch a motherfucking case and I don't give

6    a fuck."

7            Your Honor, based off of the video, then, I won't go

8    into what another video says because I haven't presented those.

9    The government feels that the nature and circumstances of this

10   crime are strong.  There is an arson that is taking place in

11   the midst of all of these protesters.

12           And I will admit -- and it is true, you will see in

13   the video -- once the van fire starts, no one goes near that

14   van.

15           And, thankfully, no one was around when the van went

16   off a couple of times.

17           There were a couple of what seemed, like, mini-

18   explosions.  So, no one was hurt.

19           And no one went around the van went around the van

20   because they saw that the van was lit.

21           But those actions placed the public in high danger.

22           Not knowing what else was in there, whether the van

23   was going to blow or whether it was just going to be a regular

24   fire, the defendants did not know that and they placed the

25   public at a high danger at that point.

1          Additionally, your Honor, the strength of the

2    evidence.  The government has video.  The video shows the

3    defendants setting the fire from different angles.

4          And there is also other video that shows the

5    defendants' arrest to the day.

6          Mr. Taylor has a Facebook video in the same clothes,

7    the same items, of him -- the same clothes, excuse me -- on the

8    same day.

9          The defendant, Mr. Stewart, going downtown, not to

10   protest, but to cause some trouble.  Trouble that they did when

11   they started the fire.

12         So, we believe that the circumstances are -- it's a

13   very violent crime.  The circumstances are very harsh.  And

14   that there is a -- that we have a strong case and there is a --

15   high weight of the evidence.

16         I will go individually at this point.  I will --

17         THE COURT:  Let me interrupt you, Mr. Berry.

18         So, before we leave here, let's -- I am going to give

19   Mr. Hunter an opportunity and, then, Mr. Sassan; and, then, we

20   will break off into each individual defendant under other 3142

21   factors.

22         So, right now, Mr. Hunter and Mr. Sassan, I am focused

23   on the nature your and circumstances of the offense and the

24   strength of the government's evidence, keeping in mind that the

25   defendants are always presumed innocence.

1         But, as you both know, Congress has allowed courts to

2    consider the strength of the evidence in making detention

3    decisions.

4         So, Mr. Hunter, I will start with you.

5         Is there anything you want to explore about those two

6    factors as they relate to the evidence presented by the

7    government today?

8         MR. HUNTER (Via Telephone):  Yes, Judge.

9         First, I would like to highlight the fact that case

10   law makes it clear that the weight of the evidence is the least

11   important factor.

12        That said, I would say that the State's interpretation

13   of the videos, I don't share.

14        With respect to the first video where counsel -- or

15   Mr. Berry -- claims that you see my client lighting a flame by

16   the back of the van, I have seen this video three times.  I

17   don't see that anywhere.  I just saw it just now.  I don't see

18   that anywhere.

19        I believe he says at 7:43:55, "You see flames at the

20   back of the van."

21        The only flames you see is when the person in the pink

22   hat, who he has identified as Lindsey, is lighting it.

23        In addition, the video isn't a close-up.  You don't

24   know who that person is.

25        What Mr. Berry wants to say is because somebody who

1    had the same type of ball cap -- and I would submit that it is

2    a very common ball cap -- and a sleeveless T-shirt, which is

3    what, in the Facebook video my client is wearing, because

4    somebody else has a common ball cap and a common T-shirt, that

5    must be the same guy.

6            But I don't think that they have established, first,

7    that Mr. Stewart isn't the person in the videos.

8            And, then, the person who Mr. Berry claims is the

9    person in the videos, never lights any flames with respect to

10   the video where Mr. Stewart -- the alleged Mr. Stewart -- who

11   they haven't established -- and the alleged Mr. Taylor, are by

12   the front of the van and, then, he says, "You see flames?"

13           You see something flash briefly; but, if you continue

14   to play the video, what you don't see is the van bursting into

15   flames.

16           In fact, Mr. Taylor -- or the person he claims is Mr.

17   Taylor, the person in the orange shirt -- goes into the van

18   after that moment.

19           Now, why on Earth would somebody go into a fire?

20           I submit to you that that wasn't the fire, that

21   Mr. Taylor -- or the present alleged to be Mr. Taylor --

22   wouldn't go into a burning van.

23           And, then, there is a later point in time where Mr.

24   Berry has lumped the alleged Mr. Taylor and the alleged Mr.

25   Stewart together.

1    But, in fact, the person in the orange shirt is in
2  front of the person that Mr. Berry claims is my client.  And
3  he's in the van.
4    My client is just -- if it is my client; and, I don't
5  think that has been established -- that person is simply
6  standing there.
7    THE COURT:  All right.
8    MR. HUNTER (Via Telephone):  In addition, with respect
9  to the Facebook video -- I'm sorry?
10    THE COURT:  Well, let me stop you there, Mr. Hunter.
11    So, one, you don't disagree that the van eventually is
12  engulfed in flames, correct?
13    MR. HUNTER (Via Telephone):  I do not.  I do not.
14    THE COURT:  Okay.
15    So, you agree at some point a fire was started to the
16  van?
17    MR. HUNTER (Via Telephone):  Yes.
18    THE COURT:  Okay.
19    And as far as the details of what happens, again, for
20  trial purposes, will be explored in much greater detail; but,
21  for our purposes here today, the person the government believes
22  to be Mr. Stewart, you agree that he went back with the
23  cardboard and placed that in the front part of the van,
24  correct?
25    MR. HUNTER (Via Telephone):  I would agree with that.

```
 1              THE COURT:  And you agree cardboard is a combustible
 2    item, correct?
 3              MR. HUNTER (Via Telephone):  Cardboard will burn, yes.
 4              THE COURT:  And that soon thereafter, there is smoke
 5    emanating from the van and, then, flames?
 6              You agree with all of those things?
 7              Again, not agreeing that it is Mr. Stewart, but --
 8              MR. HUNTER (Via Telephone):  Yes.
 9              THE COURT:  -- you agree all of those things happened?
10              MR. HUNTER (Via Telephone):  Yes.
11              THE COURT:  Okay.
12              Go ahead, Mr. Hunter.
13              MR. HUNTER (Via Telephone):  Well, I think you have
14    summarized what could reasonably be claimed based on these
15    tapes.
16              And, then, they go into a bunch of statements made by
17    Mr. Taylor.
18              You know, I didn't hear my client saying, "Yeah, yeah,
19    yeah."
20              And he doesn't say much, in my opinion.
21              And, then, with respect to the high danger,
22    Mr. Berry's own words show that this is pure speculation.  He
23    keeps saying they didn't know what was in the van.  Okay?
24              Well, then, if they don't know what is in the van,
25    then how can he say it is a high danger?
```

1        I mean, yes, the van burned.  A fire -- if you play
2    the whole video, you see a fire truck come and they hose down
3    the van and it is put out.
4        Nobody is near the van.  The van doesn't blow up.
5    Nobody is in any danger at any point in time.
6        I would say the people who might arguably be said to
7    be in danger are the people who Mr. Berry is charging with
8    crimes.
9        And, then, there are other people who were taking
10   items -- stealing items -- out of the van.  So, I don't think
11   that he can say the public was in danger and, yet, say that the
12   people are all breaking the law.  It wouldn't be the public.
13   It would just be the people who were looting the van.
14       THE COURT:  All right.
15       MR. HUNTER (Via Telephone):  And I still don't see how
16   that can be a danger.
17       In addition, Judge --
18       THE COURT:  Well, let me stop you there, Mr. Hunter.
19       MR. HUNTER (Via Telephone):  Okay.  Sure.
20       THE COURT:  Let me stop you there.
21       The vans -- as of today, the vans -- still run on
22   gasoline, correct?
23       MR. HUNTER (Via Telephone):  Yes.
24       THE COURT:  And the fire set to a vehicle that has
25   gasoline in it poses an inherent danger; does it not?

1          MR. HUNTER (Via Telephone):  I would not concede that,
2   Judge.
3          THE COURT:  Okay.
4          All right.  Reasonable minds can differ on that.
5          Go ahead.
6          MR. HUNTER (Via Telephone):  Well, so, you know, I see
7   why the government wants to start with, you know, the weight of
8   the evidence because the rest of the case cries out for a bond.
9   But we are not at that point.
10         Is that my understanding?
11         THE COURT:  That is correct.
12         MR. HUNTER (Via Telephone):  Okay.
13         Well, I would submit to you that whoever the person in
14  the pink hat is, is the one that lit the van on fire, not my
15  client.
16         And if what they have is, supposedly, my client
17  putting the cardboard box into the van, I would submit that the
18  van would already be full of flammable material and that that
19  had a marginal effect on the arson.
20         THE COURT:  All right.  Thank you.
21         Mr. Sassan, anything as to the nature and
22  circumstances of the offense or the government's strength of
23  the evidence?
24         MR. SASSAN (Via Telephone):  Thank you, your Honor.
25  Yes.

1          In large part, I would repeat Mr. Hunter's argument

2   regarding identification.

3          The identification is based on a shirt -- the color of

4   a shirt -- and, then, the video on the way down from my

5   client's Facebook -- or from a Facebook -- page, with a similar

6   short shirt.

7          The other point, your Honor, is in the first video we

8   saw Mr. Taylor -- and I am going by my recollection, but

9   Mr. Taylor was not present in there.  It was only -- well, only

10  to where you could -- well, let me go back.

11         The individual alleged to be Mr. Taylor wasn't present

12  in that first video other than the person alleged to be

13  Mr. Taylor walking to the front.

14         And, as the government mentioned, the first video does

15  not show what was happening when that person went to the front

16  door.

17         I would submit that the second video is not

18  conclusive, either, that those two individuals by the front

19  door, one of which was alleged to be Mr. Taylor, started the

20  fire.

21         There was, as stated, a person in a pink cap that

22  seemed to light something from the back.  And there is no --

23  the video doesn't demonstrate whether those two people by the

24  driver's side door were merely taking things out or starting --

25  or if what seems to be a flame is the result of what the person

1    in the pink cap started from the back.

2              Now, the other point being the Facebook video of my

3    client on the way down, I would submit, your Honor, that, in

4    large part, you know, people -- that you have to take what

5    people are saying with a grain of salt on Facebook, you know,

6    in terms of whether it is really intended that they are going

7    to do that.

8              But even if you were to consider what was stated on

9    the Facebook page as something that was intended, I would say

10   nothing that was stated had anything to do with starting

11   anything on fire.  It did have something to do with potentially

12   stealing things.

13             And if that were true that would be consistent with

14   the two individuals by the driver's door taking stuff out of

15   the van, but not starting on fire.

16             The other point on the Facebook video is this, your

17   Honor.  On that page, on the same day, there is two additional

18   video screens of Mr. Taylor and the group of people that he was

19   with down there, who are merely standing on the street

20   observing the protests and the different activity and the

21   different actions.

22             And, in that, they seem to be focusing at one point --

23   it looks like they are on Michigan Avenue looking towards

24   Wacker Drive and the river -- and commenting on what seems to

25   be some activity that could turn violent.  And you hear them

1   say that they don't want to get anywhere near that.

2           So, I would say that the two videos that are posted

3   after the drive down would support the position that,

4   basically, on the video on the way down, my client was kind of

5   bragging or talking himself up, but not really intending to do

6   that. Because in the next two videos, they are not getting

7   involved.

8           And, in fact, they state that they don't want to go

9   anywhere near what appears to be, you know, kind of a violent

10   or a, for lack of a better term, kind of a hot area of the

11   protest that day.

12           And, so, I would submit those arguments on behalf --

13   in terms of this portion of the hearing, on behalf -- of

14   Mr. Taylor, as to both the strength of the case, in terms of

15   whether he started or had anything to do with starting that van

16   on fire, as -- with his identification and, actually, starting

17   it, as well as his intention going downtown, based on the two

18   videos that the government did not discuss from that same

19   lineup -- I am sorry, from that same day -- after he and his

20   group were downtown and watching the protest.

21           THE COURT: All right.

22           Thank you. Mr. Sassan.

23           All right, Mr. Berry, please now turn to Mr. Stewart,

24   as far as other 3142 factors; and, then, Mr. Hunter, I will

25   hear from you.

1          MR. BERRY (Via Telephone):  Thank you, your Honor.

2          I agree with Pretrial, in the case of Mr. Stewart, and

3    recommend detention -- and their recommendation of detention --

4    that there is no combination of conditions to reasonably assure

5    his appearance and the safety of others in the community.

6          By my count, Mr. Stewart already is a Category VI

7    offender at the age of 24.

8          He -- it seems like he -- has about 15 criminal

9    history points.  And I will start here.

10         He was on parole when he committed this offense.  His

11   parole didn't end until -- give me one second, your Honor; let

12   me get the exact date -- until October 28th, 2020.  It seems

13   that that was, from Pretrial's report, that was his discharge

14   date from parole.

15         This happened in May -- May 30th of 2020.

16         So, while he is out there, whether the Facebook video

17   is correct, that he is just going down there to steal some

18   stuff or he is going down there and he wound up setting this

19   fire, which he did, he did this while he was on parole.  And

20   that gives him two points.

21         He has a residential burglary conviction; two

22   possession of stolen motor vehicle convictions; and, a plea to

23   a misdemeanor for obstructing and resisting.

24         And the one that I left out is escape.  He was on bond

25   in State Court on electronic monitoring and a warrant was

1   issued for him and he was charged and pled to escape, where he

2   got two years of incarceration in the Illinois Department of

3   Corrections.

4          This defendant will not show up to court.

5          On his first arrest, when he had 30 months' probation,

6   he had four violations of probation.  Two times he didn't show

7   up to court.  It resulted in a termination of his probation,

8   where he got four years' IDOC custody.

9          His Pretrial is littered with warrants and

10  non-appearances.

11         And I would say that the escape conviction, in and of

12  itself, shows that he is a danger of not showing up to court.

13         Additionally, with regard to the video I would just --

14  Mr. Hunter said that he is not a danger to the public because

15  no one was around the van.

16         The fact that no one went around the van was smart for

17  the public because the van was on fire.

18         While the van was smoking and before it was on fire,

19  this is in the middle of a protest where you see hundreds of

20  people walking there on the street.  And they decide to set the

21  van on fire.

22         That is a danger to the public, in and of itself.

23         And, so, I would stand with that, your Honor, and I

24  would say that there is no conditions or set of conditions that

25  would assure -- reasonably assure -- Mr. Stewart's appearance

1    in court and the safety of the community.

2              THE COURT:  All right.

3              Thank you, Mr. Berry.

4              Mr. Hunter, I will say, candidly, I am interested,

5    when you said that this case screams for bond, I spent a good

6    amount of time reviewing both of these reports; and, as an

7    experienced defense attorney, I am surprised you have that view

8    because Mr. Stewart's background is very disturbing.

9              So, explain to me why this screams for bond.

10             (No response.)

11             THE COURT:  Mr. Hunter?

12             (No response.)

13             MR. HUNTER (Via Telephone):  Sorry, Judge.  I was

14   muted.

15             THE COURT:  That is all right.

16             MR. HUNTER (Via Telephone):  Let me give you a little

17   background on Mr. Stewart, to begin with.

18             He is a 24-year-old young man who lives with his

19   mother, Renee Stewart.  He has three young children with whom

20   he is very close.

21             He has lived in the Chicago area his whole life,

22   except for one year when he was 5 or 6 and he lived with his

23   grandma in Indianapolis.

24             His immediate family, which includes his mother and

25   two sisters, live in Chicago.  His girlfriend lives in Chicago

1    and his children live in Chicago.

2            He has dreams of being a truck driver and is scheduled

3    to begin truck driving school at CR England Truck Driving

4    School, 600 Belle Park Road, Valparaiso, Indiana, on March 8th

5    of 2021.

6            He also hopes to acquire a GED.

7            Now, while he does have four felony convictions, these

8    convictions happened when he was 17, 18 and 20.  And I would

9    submit to you that people in their teens are more prone to

10   irresponsible behavior.

11           His crimes, none of them involve violence.  They are

12   all property crimes:  A burglary, two PSMVs and an escape.

13           And I would just like to say, Judge, with respect to

14   "escape," that meant he was on electronic monitoring and he

15   didn't come to court.

16           You can be charged with escape for electronic

17   monitoring if you go out into the alley to smoke a cigarette

18   and a box alerts.  It doesn't take much to be "escape."

19           You know, I am sure that Mr. Berry wants to paint the

20   picture of him fleeing to Utah or something, but he never left

21   the jurisdiction.  And now that he is 24-years-old, he is more

22   responsible and more likely to appear.

23           I would like to highlight the fact that under

24   3142(e)(2) and (e)(3), this is not a presumption of detention

25   case.  The presumption should be for release.

1     The government has the burden to show -- and it is

2 reasonable to show -- that there are no conditions, none, that

3 will work to protect the public and ensure my client's

4 appearance in court.

5     Now, all you need to release my client is a reasonable

6 assurance, not a certainty, that my client will comply with

7 your conditions.

8     There are a great -- a great -- number of conditions

9 that I will address momentarily, but, first, I want to talk

10 about the Pretrial Services report.

11     The Pretrial Services report and its recommendation

12 are deeply flawed and I don't think you should put much weight

13 in them.

14     First, it relies on a substance abuse history; but,

15 according to the report, itself, that history is extremely old.

16     Mr. Stewart reported that he received treatment in

17 2013, eight years ago.  There is no evidence of current drug

18 abuse.

19     Lack of verifiable employment was listed.  He actually

20 told Pretrial Services that he was about to enroll in truck

21 driving school.  So, why would have he have a job if he is

22 about to start school?

23     To use the fact that he is pursuing an education

24 against him to try to detain him is unfair and unjust, to put

25 it mildly.

1          Now, I would note that 3142(g) does allow the Court to

2     consider my client's mental health history, but there seems to

3     be this misunderstanding by most Pretrial Services officers

4     that if somebody reports that they have a mental health issue,

5     that they should be detained.

6          That is not what the law says at all.

7          The reason you should consider his mental health

8     history is if you want to make counseling or treatment part of

9     the conditions of his release, or something like that.

10         But the fact that he has a Bipolar Disorder doesn't

11    prove -- establish -- somehow that he is a danger to the

12    public.  And I don't think that that is an appropriate reason

13    to lock somebody up.

14         Finally, the Pretrial Services report cites a pattern

15    of similar criminal activity.  That is just false.  His prior

16    crimes are property crimes.  There is nothing, like, an arson

17    in his background.  There is no violence in his background.

18         The fact that there is no violence in his background

19    shows that the public is not a danger.

20         Now, even if we want to assume, for the sake of

21    argument, that he is the person in the video -- and I don't

22    think that has been established, but just for the sake of

23    argument -- the only thing that video shows him doing, if it is

24    him, is throwing a cardboard box through a van window.

25         You can't even tell if he knows that the van is on

1   fire at that point.

2           But nobody is around.

3           Mr. Berry mentioned hundreds of protesters in the

4   street.  You don't see any protesters.  You see looters in that

5   video.  You don't see any protestors.  And certainly not

6   hundreds.

7           A few people are on that video.  Those people are

8   either trying to take things from it or light it on fire.

9           And, then, they all leave.

10          So, the danger element certainly hasn't been

11  established.

12          With respect to the (g) factors, it was the George

13  Floyd -- it was the day -- or what was going on that day, it

14  was a response to George Floyd.

15          Now --

16          THE COURT:  Mr. Hunter?  Mr. Hunter?

17          MR. HUNTER (Via Telephone):  Yes, sir.

18          THE COURT:  Respectfully, please don't use your time

19  for that because --

20          MR. HUNTER (Via Telephone):  Okay.

21          THE COURT:  -- what was shown had nothing to do with

22  George Floyd.

23          You may say, "It is not my client."  That is fair for

24  you to take.

25          MR. HUNTER (Via Telephone):  Uh-huh.

1          THE COURT:  To say whoever is in that video is

2    protesting anything socially constructive, I am not buying that

3    argument.

4          MR. HUNTER (Via Telephone):  Well, I am glad to hear

5    that because --

6          THE COURT:  Maybe somebody someone else will, but I am

7    not going to.

8          MR. HUNTER (Via Telephone):  I am glad to hear that

9    because Mr. Berry seemed to suggest that there were a bunch of

10   peaceful protesters around the burning van.  And I just don't

11   think that is the case.

12         THE COURT:  Well, the Court will take judicial notice

13   that on that day there were protests regarding George Floyd.

14         The issue is the people involved in this conduct, that

15   the government is showing, were they involved in First

16   Amendment activity or were they involved in something else?

17         I am not saying --

18         MR. HUNTER (Via Telephone):  I am not arguing --

19         THE COURT:  Mr. Hunter?

20         MR. HUNTER (Via Telephone):  I'm sorry.

21         THE COURT:  I am sorry.

22         Mr. Hunter, one of our ground rules were we need to be

23   very mindful of the court reporter.

24         I am not going to entertain argument from anyone that

25   the conduct that is shown on the video has anything to do with

1   protests related to socially-conscience issues.  That is not

2   what I am going to entertain.  And if you find that erroneous,

3   you can take that up with someone else.

4           MR. HUNTER (Via Telephone):  Judge, that is not my

5   argument.  You misunderstood my argument.  Can I please

6   clarify?

7           THE COURT:  Sure.

8           MR. HUNTER (Via Telephone):  Okay.

9           What I am arguing is the events of that day are not

10  going to be repeated.  There was a social unrest that day.

11          That is not going to happen tomorrow or the next day

12  or the next day.  And, therefore, the danger to the public is

13  minimal.

14          But I would like to move on to some of the other (g)

15  factors.  The fact that my client is a lifelong resident of

16  Chicago; that he has strong family ties to the community; that

17  his mother, girlfriend and three small children and sisters

18  live here; that he only has property crimes in his background;

19  that the government, obviously, didn't think he was too big a

20  danger, since they didn't arrest him for months and months;

21  and, that all of those factors, I think, show that he, with the

22  proper conditions, could be released.

23          Now, some of those conditions include being a third-

24  party custodian.

25          The Pretrial Services report says that his mother, who

1    appears, from my reading of her background, to be a very

2    suitable third-party custodian, is willing to serve.

3           You could order that he maintain his education of the

4    truck driving school; requiring him to pursue a GED; you could

5    put him on electronic monitoring and/or curfew; and, if you

6    have any concerns about him currently using drugs, you could

7    order drug testing.

8           If you applied all of those conditions, given that the

9    only allegation of violence in his background is this case, I

10    think that you could be reasonably assured that they -- the

11    public -- would be safe and that my client will come to court.

12           THE COURT:  All right.

13           Anybody further, Mr. Hunter?

14           MR. HUNTER (Via Telephone):  No, Judge.  Thank you.

15           THE COURT:  All right.

16           I am going to make my findings first to Mr. Stewart;

17    and, then, we will turn to Mr. Taylor.

18           As to the issue of danger to the community, the

19    government needs to present clear and convincing evidence to

20    justify detention.  I find the government has done that.

21           As far as risk of flight, it is a preponderance of

22    evidence.  I find the government has done that.

23           I will make an oral reasoning now and we will also

24    issue a written order.

25           My read of the statute concurs with Mr. Hunter.  I do

1    not think this is a presumption case.

2           Mr. Berry, do you disagree or agree with that?

3           MR. BERRY (Via Telephone):  I agree with you, your

4    Honor.

5           THE COURT:  All right.

6           Next, I look at the statutory considerations, keeping

7    in mind that nothing I say here should suggest that the

8    defendant's presumption of innocence does not continue today,

9    throughout the criminal proceedings, until a jury decides

10   otherwise or there is a guilty plea.

11          First, the offense is a serious offense.

12          There has been some discussion about the nature of

13   this offense and whether or not the public was at risk.

14          I agree with the government that the public was at

15   risk.  The fact that no one got hurt is just happenstance.  But

16   setting fire to a van, that, one, is run by gasoline; and, two,

17   is a service van for the CTA and can contain and may have

18   contained all sorts of flammable containers, put the

19   government -- I am sorry, put the public -- at potential risk.

20          Therefore, I find the offense, both the nature and

21   circumstance and the general offense of arson, are serious

22   offenses.

23          The weight of the evidence against the defendant I

24   find is substantial and, therefore, weighs in favor of

25   detention.

1         The defendant's character weighs strongly in favor of

2    detention.

3         While Mr. Hunter vigorously argues about the nature of

4    defendant's prior convictions being property offenses, that

5    does not change the fact that the defendant has multiple felony

6    convictions, and while he was placed on various form of

7    release, including probation and parole, was unable to follow

8    those conditions.

9         There is, unfortunately -- and I say this very

10   mindfully, there is -- nothing in the defendant's background

11   that suggests he is of good character.

12        He is a young man.  Mr. Hunter tries to distance his

13   criminal conduct from his current age.  But, in fact, these all

14   happened -- he is only 24 years old; he is a young man and

15   these all happened -- in his late teens and 20s, which is not a

16   far distance from where he is now.

17        The defendant's physical condition weighs in favor of

18   release.

19        Mr. Hunter made the point that defendant's mental

20   condition should not be used to detain him.

21        I think Mr. Hunter has a valid point, that someone who

22   has a mental health condition and is seeking treatment or

23   receives treatment should not be detained because of that.

24        However, that is not the situation presented here.

25   Mr. Stewart has been diagnosed with Bipolar Disorder in 2009;

1   but, according to his mother, he is not being currently treated

2   for that condition.

3        That leaves a question in my mind as to the status of

4   his mental health.  Not that it is not perfect -- I agree with

5   Mr. Hunter -- but whether it is being properly treated.

6        Therefore, his mental health condition weighs in favor

7   of detention because it is not being currently treated, based

8   on what we know.

9        Defendant's family ties I find neutral.

10       Mr. Hunter is correct.  The defendant has family here.

11  He had a close relationship with his mother.  However, the

12  Pretrial Service report also indicates that he has three

13  children.

14       The defendant says he maintains daily contact with his

15  children.

16       The defendant's mother, however, stated that her son

17  is single with only one child that resides in Chicago.

18       Therefore, I have questions about how well his mother

19  knows about her own son's family connections.

20       I find family ties are neutral.

21       The defendant's employment history weighs in favor of

22  detention.

23       Mr. Hunter raises a point that the defendant was

24  seeking at CDL; and, therefore, increasing his education; and,

25  therefore, his lack of employment should not be held against

1   him.

2           I don't agree with that argument.  Many people are

3   employed; and, then, in their employment, they then decide they

4   are going to seek higher education or technical training or

5   some type of other enhancement to their skill set.  And they

6   may stop working once they enter a new program.

7           But Mr. Stewart doesn't have any employment history to

8   speak of.  It weighs in favor of detention.

9           The Court generally does not consider a defendant's

10  lack of financial resources as a factor weighing in favor of

11  detention, as this would allow the Court to detain someone

12  based on their poverty, which the Court does not consider an

13  appropriate application of the law.

14          The defendant's length of residence in the community

15  and his community ties weigh in favor of release.

16          The defendant's history relating to drugs or alcohol

17  abuse is concerning.

18          He has indicated that he has been ordered to

19  participate in drug programs.  I am not sure where that stands.

20  I find it a neutral factor in this case.

21          Again, defendant's criminal history weighs strongly in

22  favor or detention for the reasons I have already explained.

23          Mr. Berry raises the issue of the defendant's history

24  of appearing in court.

25          His history of both appearing in court and complying

1  with conditions of release is very poor.  I find that factor

2  alone meets the government's burden of showing, by a

3  preponderance of the evidence, that he is a risk of flight.

4          I don't find any particular seriousness of danger to

5  an individual in the community.  So, that factor is not

6  applicable.

7          Finally, the charged offense occurred while defendant

8  was on parole, which is a statutorily identified factor

9  weighing in favor or detention.

10          In summary, those factors, as explained, weighs

11  strongly in favor of detention.  It meets the government's

12  burden of clear and convincing evidence of danger to the

13  community, and preponderance of the evidence as risk of flight.

14          Mr. Hunter proposes, and the Court must consider,

15  alternatives to detention.  The fact of the matter is, is that

16  the defendant was on parole and has a history of being on

17  parole or probation and committing other offenses, that lead to

18  felony convictions.

19          Pretrial Services, while they are very committed law

20  enforcement officers, there is nothing about this situation

21  that makes me think the outcome would be different.

22          Mr. Stewart has failed to comply with the conditions

23  of release in the past.

24          Even while he was presumably supervised by state

25  probation officers and state parole officers, they were unable

1    to keep Mr. Stewart from violating conditions.

2            I see no reason why electronic monitoring, coupled

3    with the talents of Pretrial Services here, would result in any

4    different outcome.

5            For those reasons, I find there is no condition or

6    combination of conditions that would satisfy this Court that

7    the defendant will appear and not be a danger to the community.

8            I am going to order the defendant detained.

9            As I said, we will be issuing a written order.

10           Mr. Berry, do you want me to make a further record of

11   my finding here?

12           MR. BERRY (Via Telephone):  This is Albert Berry.

13           No, your Honor.

14           THE COURT:  Mr. Hunter, do you want me to a make a

15   further record of my finding here?

16           MR. HUNTER (Via Telephone):  No, thank you, Judge.

17           THE COURT:  Thank you.

18           And thank you for your argument.

19           Next --

20           THE DEFENDANT STEWART (Via Telephone):  Judge, Judge,

21   this is Mr. Stewart.

22           Isn't there anything I could say?

23           THE COURT:  You can talk to Mr. Hunter.

24           Mr. Hunter, would you want your defendant -- your

25   client -- saying anything?

 1          MR. HUNTER (Via Telephone):  I do not.

 2          THE COURT:  All right.

 3          Mr. --

 4          THE DEFENDANT STEWART (Via Telephone):  Mr. Hunter, I

 5   have things to say.

 6          I was not on parole when nobody -- when this case

 7   occurred.  So, I don't know what is going on.

 8          THE COURT:  For the record, the Court is relying on a

 9   Pretrial Service report, Page 8:  "According to IDOC records,

10   the defendant's status is noted as bond, and discharge date is

11   currently pending."

12          The report continues, "There is a discharge date of

13   October 28th, 2020."

14          THE DEFENDANT STEWART (Via Telephone):  Well, I am

15   just trying to finish my school education, your Honor.  I'm

16   trying to just -- I'm trying to better myself.

17          I have been out of jail for a year, four months.

18          MR. HUNTER (Via Telephone):  Judge, I could certainly

19   investigate the accuracy of that.

20          May I inquire if it turns out he is not or was not on

21   parole, would that change your ruling?

22          THE COURT:  No, it will not.

23          THE DEFENDANT STEWART (Via Telephone):  But I've been

24   out of jail for a year and four months.  I've been doing good.

25   I've been working.  I've been working at Red Snapper in Hyde

1   Park.

2          THE COURT:  All right.

3          Mr. Stewart, I am sorry you disagree with my

4   conclusion, but that is my conclusion.

5          Mr. Berry, please turn now to Mr. Taylor.

6          THE DEFENDANT STEWART (Via Telephone):  Isn't there

7   nothing I can do, man?  I'm trying to get home to my family.

8          You're all trying to keep my away from my family, your

9   Honor.

10          THE COURT:  Mr. Stewart, please stop talking so

11   Mr. Berry can continue with the hearing.

12          THE DEFENDANT STEWART (Via Telephone):  I understand.

13          MR. BERRY (Via Telephone):  Thank you, your Honor.

14          In regards to Mr. Taylor, the government also agrees

15   with Pretrial's recommendation for detention, that there is no

16   combination of conditions that can reasonable assure the

17   defendant's appearance and the safety to the community.

18          I will stand on the record the same arguments I have

19   made with regards to the danger to the community for the arson

20   for Mr. Stewart.  I make those same arguments with Mr. Taylor.

21          If your Honor is okay with that, I just won't restate

22   those arguments, again.

23          Is that okay?

24          THE COURT:  That is fine with me.  Thank you.

25          MR. BERRY (Via Telephone):  Thank you, your Honor.

1          With regard to the defendant's history and

2   characteristics, I will start with the Pretrial report.

3          According to the Pretrial report, the defendant has

4   four active warrants and understanding that only one of those

5   is a felony.  I understand that.  However, those are still four

6   active warrants and those warrants are for the defendant not

7   appearing in court.

8          And, if not, the defendant not appearing in court in

9   person, it is during COVID times not appearing for what appears

10  to be, like, video court.

11         So, if the defendant is not going to appear for video

12  court during the times of COVID, it is the government's

13  position that as we move forward and, you know, there may be

14  requirements for the defendant to appear in person, he won't do

15  so, either, as his history states that.

16         I will say there is also a section that talks about

17  other release pending trial.

18         The defendant, though he was not on any kind of parole

19  or supervision, he was under the supervision -- under an I-

20  bond.  And that bond in state court, I understand, that it is a

21  personal recognizance and there is an amount that is set to it;

22  however, he was under that condition to appear back for court

23  when he committed this crime, understanding it is not parole or

24  probation.  I get that.

25         And I just wanted to focus -- the last thing I will

1    focus -- on is the first part of the history and
2    characteristics of the person.
3          Under 3142(g)(3)(a), it talks about the person's
4    character.  And what better evidence to have a person's
5    character than their own words.
6          And I would rely on that first -- on the Facebook --
7    video that was presented to the Court of the defendant and his
8    own words to describe his character.
9          He said it in his words -- and I won't use the
10   profanity -- he does not care.  He does not care.
11         His history, he has fought with police officers.  And
12   we know what the crime is here.
13         And I would stand on that, your Honor, to say that the
14   defendant he will not appear in court, he is a danger to the
15   community and we are asking that he be detained.
16         THE COURT:  Thank you, Mr. Berry.
17         Mr. Sassan?
18         MR. SASSAN (Via Telephone):  Thank you, your Honor.
19         First, it is not a presumption of detention case.  And
20   we believe there is a set of conditions that your Honor can
21   impose that would the make the case against detention in this
22   case.
23         First, in terms of a danger to the community, I would
24   touch on -- actually, in terms of prior convictions, there
25   appears to be only one prior conviction for my client, which

1    would indicate that he is not typically out committing crimes.

2              With that, I would add that in light of the nature of

3    the protest, it was an emotionally charged day.  And I say that

4    because I think that certain people's conduct, though it may be

5    considered criminal, might not be an indication that this is

6    the way that they normally behave.  And, as such, it wouldn't

7    be necessarily indicative that if it were him that set the

8    fire, that this is the type of conduct he typically engages in

9    and would be a danger to the community.

10             I think that the nature of the day and how it was

11   emotionally charged may have also affected the words used in

12   the video that the government relies on, in terms of, as I

13   mentioned before, kind of puffing or bragging or exaggerating

14   his position.

15             And, as I have pointed to your Honor, there are two

16   other Facebook pages -- live recordings on the Facebook Live --

17   where my client is merely watching the protest and indicating

18   that he wanted to stay away from the trouble that was down

19   there.

20             While the case is labeled an arson and we don't

21   dispute that, you know, there was a potential for danger in

22   this case, the actual actions here are similar to a very

23   serious kind of prank.  But, again, I say that to highlight

24   that this is not the type of conduct that he would typically or

25   has typically involved himself in, if this instance, in fact,

1   was him that started the van on fire.

2          Again, the fact that would highlight this, no one was

3   in the van.  It should also be considered not only as just a

4   luck of the circumstances, but may also have contributed to the

5   individual decisions to start the van on fire, thinking that,

6   you know, no one is there and no one is going to get hurt,

7   whether or not that is true.  But I think it should be in

8   consideration as to the evaluation of whether this conduct

9   would indicate a danger to the community.

10          The -- and I forgot, your Honor, I believe that Ms.

11  Lee is on this call and has been.  She is the proposed

12  third-party custodian.

13          And, so, going into the personal conditions and -- I

14  am sorry, the personal circumstances of my client -- as the

15  Pretrial report indicates, he is a lifelong resident of

16  Chicago.  He lives with his grandmother.

17          What is not included in the Pretrial Services report

18  is that his grandmother, Margaret Kerr, resides a couple of

19  doors away from Ms. Lee.  So, essentially, my client's entire

20  life is on that block, within a couple of houses of each other.

21          And, with that in mind, he officially lives with his

22  grandmother, but he spends much time with Ms. Lee, with whom he

23  has known his entire life, since they were kids, for which he

24  has been in a committed relationship for several years and

25  which has resulted in a young son that they raise together and

1    with his family.

2              So, as I said, his entire life and the purpose for

3    being is in Chicago.  And he has no history of travel from

4    Chicago.

5              Ms. Lee, also, works as a Safe Passage Youth Family --

6    a Safe Passage Office person -- that helps the kids get to and

7    from school safely.

8              I believe she would be an appropriate third-party

9    custodian.

10             My client's other factors, in terms of employment,

11   while he is currently unemployed, it appears it was related to

12   layoffs caused by the pandemic.

13             But he is a CDL truck driver and it appears that he is

14   able to return to work, now that his license is reinstated.

15             Obviously, that would be a force in raising a family.

16   It would also further establish his ties to the community as

17   someone who is employed and working.

18             Some of the other factors, your Honor, I can touch

19   briefly on the mental health status indication.  I would tend

20   to say that this would favor release because it was an issue

21   that was self-reported by my client to Pretrial Services.

22             There has been no diagnosis for the condition he

23   described.  And the condition he described, if it were

24   something that could be diagnosed, is something that resulted

25   from him witnessing a good friend of his being shot in his

1   immediate present -- shot and killed in his immediate presence.

2          It is also a condition where there is no indication

3   that he has necessarily acted out in any dangerous way as a

4   result of that.

5          Next is the majority of -- as counsel indicated, the

6   issue with the pending cases and the warrants, I -- there

7   appears to be one outstanding warrant on a case.  And the

8   reason why I say "appears," is I had forwarded your Honor some

9   -- or through your court officer some -- pdfs of the electronic

10  docket that attorneys are able to obtain through the Circuit

11  Court of Cook County.  And my comment being is I am not sure

12  that there are four warrants based on those dockets.

13         The other thing about those dockets -- and I have

14  appeared on several of these status calls -- these remote

15  status calls in the various criminal courthouses in Cook County

16  since COVID, and the majority -- quite frankly, the majority --

17  of times defendants' witnesses -- or defendants' appearances --

18  are being waived, is if there is an attorney present.  And only

19  very rarely, in the numerous appearances I have had, have I

20  observed any warrants to be issued.  So, I am not sure if that

21  information is accurate.

22         There is an indication on the records I obtained that

23  there was a postcard warrant sent -- I am sorry, a postcard

24  notice sent -- of court dates to my client.  And I don't know

25  if they went to his grandmother's house or his -- or where it

1   went.

2          But I will say there has been an issue in my being

3   present at these hearings, in terms of whether people have

4   actually received the notices from the courthouse -- from the

5   Clerk's Office.

6          You know, it's --

7          THE COURT:  Well, let me interrupt you on that.

8          I have some questions about that issue, as well, for

9   different reasons.  And it is more just pragmatic.  It raises

10  an issue.

11         If everyone turns to Page 6, the arrest on July 23rd,

12  2018, it shows an active warrant as of July 25th, 2018.

13         What I have questions about -- and it is true for the

14  next arrest, too; is he is arrested in January of 2020 -- if

15  there were an active warrant as of 2018, there would be some

16  type of court activity based on that active warrant, based on

17  his arrest in January of 2020, or one would assume.  There is

18  none.

19         So, that raises a question to me as to what that --

20  you know, what is the nature of that warrant.

21         The Court, I have seen cases where, you know, the

22  court fails to quash a warrant than should have been quashed.

23  Things happen.  So, that raises that issue in my mind, as well.

24         Similarly, for the arrest in January of 2020, it says,

25  "Active warrant."  But, again, he has been in court since then

1    on other cases.

2            So, I am not giving much weight to those active

3    warrants because he appears to be in court after these warrants

4    are outstanding and nothing is happening in those cases.

5            So, that suggests to me that there is either a

6    ministerial error or the warrant is not actually active.

7            MR. SASSAN (Via Telephone):  I could tend to agree

8    with that.

9            I would tend to agree.  As to the warrants you

10   referred to, that was issued on 7/25 of '18, I would note that,

11   also, in terms of that same page in the Pretrial report, the

12   criminal aspect of that case was SOL'd, or dismissed subsequent

13   to that warrant being issued on 9/7 of '18.

14           And the other point as to whether or not there are

15   actually four warrants or any warrants or however many warrants

16   is in evaluating certainly whether there is a risk of flight,

17   the fact remains that Mr. Taylor has remained where he

18   ultimately lives and he has not fled.

19           So, I would tend to think, also, Judge, in one of

20   those cases, he said he had retained private counsel.  So, I

21   would say that those issue mitigate against the information in

22   the Pretrial Services report and would seem to indicate that he

23   is not a risk of flight for those reasons and would be, you

24   know, likely to appear at the proceedings in this case.

25           (Brief interruption.)

1           THE COURT:  Excuse me, whoever is on the line, can you

2    mute your phone because we are hearing all sorts of background.

3           It sounds like there is a dog and a young child in the

4    background, please.

5           Thank you.

6           Mr. Sassan, anything else?

7           MR. SASSAN (Via Telephone):  No, Judge.

8           Just coupled with that, again, the relatively light

9    criminal history of my client further would indicate that he is

10   not a danger to the community; he is not a risk of flight; and,

11   that an appropriate set of circumstances, which could include

12   home incarceration, home detention, electronic monitoring,

13   would be appropriate to both protect the safety of the

14   community, as well as to mitigate against risk of flight.

15          THE COURT:  All right.

16          Here is my order as to Mr. Taylor.

17          One, at this point I am going to order Mr. Taylor

18   detained.  I will explain why and provide an opportunity

19   perhaps for Mr. Taylor, through his counsel, to address these

20   concerns at a later date.

21          One, Mr. Berry, I presume you agree that this is not a

22   presumption case, correct?

23          MR. BERRY (Via Telephone):  Yes, your Honor, that is

24   correct.

25          THE COURT:  Okay.

1          Again, for the reasons stated as to Mr. Stewart, the

2     Court finds this is a very serious offense that weights in

3     favor -- strongly in favor -- of detention.

4          The weight of the evidence against defendant is

5     substantial.  Therefore, weighs strongly in favor of detention.

6          The defendant's character, I agree with the

7     government's argument that the social media posting is,

8     unfortunately, excellent evidence that the defendant has a poor

9     character -- at least his statements regarding his obligations

10    to society -- to comply way the law; to be respectful of

11    societal norms is minimal; and, therefore, weighs strongly in

12    favor of detention.

13         Defendant's physical health weighs in favor of

14    release.

15         His mental health, I agree with Mr. Sassan that his

16    identification of mental health issues is actually a good sign.

17         Problematic to the Court is that defendant claims he

18    believes he has Post Traumatic Stress from being shot himself

19    and having a good friend shot and killed next to him.

20         The decision-making involved in someone who has had

21    those experiences and, then, chooses to engage in the conduct

22    which the government, I think, has presented substantial

23    evidence that the defendant did engage in, is problematic, not

24    as to mental health, but as to decision making.

25         Defendant's family ties weigh in favor of release.

1          Defendant's employment history is neutral.

2          Again, I don't consider lack of financial resources as

3    a factor that should be weighed in favor of detention.  This

4    would lead to inequitable results.

5          Defendant length of residence in the community weighs

6    in favor of release.

7          His history relating to alcohol abuse weighs in favor

8    of detention.

9          I don't recall Mr. Berry mentioning this.  I know Mr.

10   Sassan did not mention this.  But the Pretrial Service report

11   indicates that the defendant self-admitted to drinking one pint

12   of Hennessy daily or often.

13         Obviously, that is, at any age, not healthy.  At a

14   young age, it is suggestive of a pattern of alcohol abuse that

15   will lead to substance -- being addicted to alcohol in the near

16   future.  That factor weighs in favor of detention.

17         Defendant's criminal history, again, Mr. Sassan I

18   think put it well.  It is relatively minor compared to at least

19   Mr. Stewart.  And, therefore, I think it weighs slightly in

20   favor of detention.

21         It is concerning, but I have seen worse.

22         I don't see any danger to any individual in the

23   community.  So, that factor is not applicable.

24         And it is not clear to me that the offense occurred

25   while the defendant was on some form of release.

1          Is it the government's view that the offense did occur
2   while he was on release, Mr. Berry?
3          MR. BERRY (Via Telephone):  Your Honor, yes -- not --
4   as I said, not on release, but I think the statute says that
5   it's -- give me one second.
6          It says, yes, on other release pending trial.
7          And it is our position that even though it is just an
8   I-Bond, I understand it is a personal recognizance bond, he is
9   on release at that point, that he should continue to conduct
10  himself in societal norms.
11         THE COURT:  All right.
12         Presuming that the government's representation is
13  correct, I don't find that factor particularly compelling.  So,
14  it slightly weighs in favor of detention.
15         That said, for those reasons, I would order the
16  defendant detained.
17         However, the Court has to consider other conditions of
18  release that may assure his appearance and the safety of the
19  community.
20         My concern and the reason I am ordering that Mr.
21  Taylor remain detained is that I am not comfortable with Mr.
22  Taylor's girlfriend serving as a third-party custodian.  She is
23  young of age herself.
24         The government represents that Ms. Lee was driving the
25  vehicle that Mr. Taylor was in as they proceeded downtown to

1  engage in what the government alleges was the criminal conduct

2  here.

3         If that is true, that is problematic to the Court, as

4  far as Ms. Lee's suitability as a third-party custodian.

5         Even if that is not true, the social media post that

6  Mr. Taylor made, presumably Ms. Lee has access to that

7  information, as well.  And, obviously, for the reasons I have

8  already stated, I have concerns about Mr. Taylor's character

9  and what it suggests about his judgment and decision-making,

10 based on that social media post.

11        And Ms. Lee as, you know, being part of his daily

12 life, has not been able to positively influence Mr. Taylor's

13 decision-making.  Therefore, I find him not -- or her -- not to

14 be an appropriate third-party custodian.

15        However, Ms. Kerr, Mr. Taylor's grandmother, may be.

16 She is not presented to the Court.  I don't know if she is

17 willing to do so.  I don't know if she is willing to sign a

18 bond of any sort.

19        So, the Court remains open to something else, not what

20 has been presented.  So, for now, I will order Mr. Taylor

21 detained.

22        Mr. Berry, do you want me to make a further record of

23 my reasoning?

24        MR. BERRY (Via Telephone):  No, your Honor.

25        THE COURT:  Mr. Sassan, do you want me to make a

1    further record of my reasoning?

2           MR. SASSAN (Via Telephone):  No, sir.  Thank you.

3           THE COURT:  All right.

4           We will issue a written order on that, as well.

5           Counsel, gentlemen, I have another hearing that I am

6    way behind on, so I am going to have to proceed to that.

7           I wish you all a good day.  And stay well.

8           Thank you.

9           MR. BERRY (Via Telephone):  Thank you, your Honor.

10          MR. HUNTER (Via Telephone):  Thank you.

11          MR. SASSAN (Via Telephone):  Thank you for your time,

12   your Honor.

13          MR. BERRY (Via Telephone):  Thanks, everybody, for

14   your patience with the videos.

15          THE DEFENDANT TAYLOR (Via Telephone):  Tony?

16          MR. SASSAN (Via Telephone):  Yes?

17          THE DEFENDANT TAYLOR (Via Telephone):  Are you able to

18   call me today?

19          MR. SASSAN (Via Telephone):  I will try to call later.

20   I have hearings all the way until 6:00 o'clock.

21          THE DEFENDANT STEWART (Via Telephone):  I will just

22   have my aunt to tell my mother to e-mail you.

23          MR. SASSAN (Via Telephone):  Perfect.

24          THE DEFENDANT STEWART (Via Telephone):  Mr. Hunter?

25          MR. HUNTER (Via Telephone):  Yes?

1          THE DEFENDANT STEWART (Via Telephone):  Is there a way

2    that you can contact me today?

3          MR. HUNTER (Via Telephone):  I can try, but typically

4    they won't let me make a call in that short a timeframe.

5    Usually, they give me three or four days waiting before they

6    can fit me in.  But I will try.

7          THE DEFENDANT STEWART (Via Telephone):  Well, yeah.  I

8    need you to contact me so we can talk.

9          MR. HUNTER (Via Telephone):  Okay.  I will try.

10          THE DEFENDANT STEWART (Via Telephone):  All right.

11                         *   *   *   *   *

12    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14    /s/ Joene Hanhardt              June 14, 2022
     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25