1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,        ) Docket No. 21 CR 105-1
 4                                     )
                           Plaintiff,)
 5                                     )
                   vs.                 )
 6                                     )
      DENZAL STEWART,                  ) Chicago, Illinois
 7                                     ) August 9, 2021
                           Defendant.) 10:31 o'clock a.m.
 8

 9         TRANSCRIPT OF PROCEEDINGS - VIDEOCONFERENCE MOTION
                 BEFORE THE HONORABLE JOHN Z. LEE
10

11    VIDEOCONFERENCE APPEARANCES:

12
      For the Plaintiff:          HON. JOHN R. LAUSCH, JR.
13                                United States Attorney
                                  BY:  MR. ALBERT BERRY, III
14                                219 S. Dearborn St., Suite 500
                                  Chicago, Illinois  60604
15

16    For the Defendant:          LAW OFFICE OF STEVEN R. HUNTER
                                  BY:  MR. STEVEN R. HUNTER
17                                900 W. Jackson Blvd., Suite 7 East
                                  Chicago, Illinois  60607
18

19    Court Reporter:             MR. JOSEPH RICKHOFF
                                  Official Court Reporter
20                                219 S. Dearborn St., Suite 2128
                                  Chicago, Illinois  60604
21                                (312) 435-5562

22              * * * * * * * * * * * * * * * * *

23                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
24              TRANSCRIPT PRODUCED BY COMPUTER

25
```

1          (Proceedings had via videoconference:)

2               THE CLERK:  21 CR 105, United States of America vs.

3     Denzal Stewart.

4               THE COURT:  Who is appearing on behalf of the

5     government?

6               MR. BERRY:  Good morning, your Honor, Albert Berry --

7     B, as in boy, e-r-r-y -- for the United States.

8               THE COURT:  And who is appearing on behalf of

9     defendant?

10               MR. HUNTER:  Good morning, Judge, Steven Hunter on

11     behalf of Denzal Stewart.

12               THE COURT:  And, Mr. Stewart, can you see and hear me

13     okay?

14               THE DEFENDANT:  I can see and hear you, sir.

15               THE COURT:  All right.

16          So, before we begin, Mr. Stewart, I want to make sure

17     you understand that you do have the right to have this hearing

18     conducted in person.  But I understand that because of the

19     COVID restrictions, after speaking with your attorney, you are

20     agreeing to have this hearing done via videoconference.

21          Is that correct, sir?

22               THE DEFENDANT:  Yes, because (unintelligible) the

23     current situation, once you leave, they would put us back in

24     quarantine.

25               THE COURT REPORTER:  I'm sorry, Mr. Stewart, you need

1    to repeat that.  I couldn't understand.

2           THE DEFENDANT:  Okay.  I'm saying, yes, that I'll

3    agree to it with respect to this current situation

4    (unintelligible) --

5           THE COURT REPORTER:  I'm only getting about half of

6    that.  I'm only getting about half of that.  There's an echo.

7           THE COURT:  Here, let me try this:  Mr. Stewart, what

8    I understand you saying is that because of the current

9    situation at the MCC, if you do appear in person, they'll put

10   you in quarantine for 14 days; and, so, it's because of that

11   that you're agreeing to have this hearing via videoconference.

12           Is that correct?

13           THE DEFENDANT:  Yes.  Yes.

14           THE COURT:  All right.  Very good.

15           So, this is Mr. Stewart's motion for pretrial release

16   after the magistrate judge, Judge Weisman, declined to provide

17   pretrial release and to order that Mr. Stewart be detained.

18           I have reviewed the submissions of the parties, and

19   I'd like to go ahead and hear from the attorneys this morning.

20           So, can I hear from defense, please?

21           MR. HUNTER:  Yes, Judge.

22           And, Judge, at the outset, I've got, I believe,

23   phoned in a woman named Lisa Cunningham, who I inadvertently

24   referred to in my motion as Henrietta Zeigler.  But she is the

25   woman who is pregnant and is my client's fiance.  And if you

1    want to hear from her, she's prepared to give testimony with

2    regard to her suitability as a third-party custodian.

3           But if you want me to go forward now, I could do that

4    right now.

5           THE COURT:  Why don't you go ahead and go forward.

6           MR. HUNTER:  Okay.

7           Well, Judge, as I stated in my motion, my client

8    should be released because he's not a danger to the community

9    and he's not a flight risk.  The government, perhaps

10   accidentally, exaggerates his criminal history.  For example,

11   they say in their reply that he has five felonies, but as I

12   state in my motion, he has four.  I go over those felonies in

13   my motion, and as you can see, they're property crimes.  They

14   are not crimes of violence.

15          His background consists of possession of a stolen

16   motor vehicle.  There was one resisting arrest.  But resisting

17   arrest covers a wide range of activity.  Things as simple as

18   tugging your arm away when you're trying to be handcuffed

19   under Illinois law can be resisting arrest.  So, there's no

20   basis to think that anything in his criminal history is a

21   crime of violence.

22          In addition, the facts in this case, which the state

23   -- or the government tries to talk about at length, don't

24   support a finding of dangerousness.  This is a property crime.

25   A van was lit on fire, which is regrettable, but no one was

1   hurt.  No one was killed.  No one came close to being hurt.

2   Yes, firemen had to put out the fire and there were people in

3   the vicinity.  That still doesn't make this a crime of

4   violence, and it's not.

5         With respect to my client being a flight risk, again,

6   the government in their pleadings exaggerates his situation,

7   perhaps inadvertently.  They keep saying he's on parole -- he

8   was on parole at the time.  He was not on parole at this time.

9   And the case I cite in my motion -- excuse me -- yeah, in my

10  motion, I cite the appellate case.  And I've spoken to the

11  appellate lawyer and the record is clear.  He was on an appeal

12  bond.  During the appeal bond, my client received zero

13  services or supervision.  He wasn't given any access to his

14  mental -- his medication for his mental health situation.

15        Now, I think that that contributed to this situation

16  greatly.  And I believe that the Court has the authority and

17  the federal criminal justice system has much better resources

18  to put in place that could ensure you that he won't miss court

19  and that he's not going to be a danger to the public.

20        The electronic monitoring GPS program in the federal

21  government is more than ample to pinpoint his location at all

22  times.  You could put him on 24-hour lockdown.  As I

23  mentioned, Ms. Cunningham is here, available to be a

24  third-party custodian.  She's got no criminal history.  We've

25  got other people, if you find Ms. Cunningham unacceptable, who

1    could be third-party custodians.  We've got several locations

2    lined up for people willing to accept him, if you're so

3    inclined.

4         I think that if he's on pretrial release, that we can

5    count on Pretrial Services to give him access to the mental

6    health treatment that he needs but that he hasn't gotten.

7         Additionally, Judge, as I mentioned in my reply to

8    the government's brief, there's a situation -- there's another

9    case, the case of Jacob Fagundo, that undermines the

10   government's whole argument that he's some great big threat

11   because Mr. Fagundo did things that were worse than my client

12   is alleged to have committed.  He put a firecracker inside of

13   a police vehicle.  Now, he got a lesser offense, and he got

14   probation.  I understand the government wanted some small

15   amount of jail time.  But to treat two people so similarly

16   situated so differently, I think, undermines the argument that

17   they really perceive him to be danger.

18        If Jacob Fagundo got a charge of civil unrest,

19   whereas my client is charged with arson and a five -year

20   mandatory minimum, there's something really wrong here.  And I

21   think that what would be compounding this injustice is to hold

22   him indefinitely in custody while we try to work our way

23   through COVID-19 criminal court.

24        My client has told me within the last few days that

25   there's a lockdown at the MCC because of another COVID

1    outbreak.

2           Now, another factual dispute that I've got with the

3    government is, I put in my motion, that he has a serious case

4    of asthma.  Mr. Berry points to medical records that say he

5    hasn't used an inhaler.  Well, that doesn't prove anything.

6    My client has been to the hospital for his asthma.  And I

7    believe that he's in serious risk, especially with the Delta

8    variant outbreak even with vaccinated people, of becoming sick

9    and possibly dying from COVID because the MCC conditions are

10   such that you just can't social distance.

11          In addition, MCC conditions are such that he's on

12   lockdown most of the time.  He can't exercise.  There are no

13   programs.  We are all better off if Pretrial Services can

14   monitor him more closely than I think he is being monitored in

15   the MCC.  The MCC is just making sure he doesn't escape.

16   Beyond that there's not a whole lot being done for him.  I

17   submit, Judge, that Pretrial Services could do much more, and

18   that would make my client's mental health condition improve.

19   It would ensure the safety of the public.  And it would -- and

20   it's not a danger to the community.

21          So, I would ask you to consider granting my request;

22   put my client on EM and GPS; have a third-party custodian;

23   keep him tied to a single residence.  If he left for any

24   reason, the authorities would know about it immediately and

25   could arrest him and put him back in the MCC.  But I don't

1    think that's going to happen.  If you give him this chance, I

2    believe that he will stay at home with his pregnant girlfriend

3    and behave the way we would all want him to behave.

4          Thank you, Judge.

5          THE COURT:  All right.  Thank you.

6          Mr. Berry?

7          MR. BERRY:  Thank you, your Honor.

8          Arson is a crime of violence.  It's defined as such.

9    Congress has found it such.  And that's what it is.  It's a

10   crime of violence.

11          I think there's a misunderstanding between Mr. Hunter

12   and I.  I've never said that his previous convictions were

13   crimes of violence.  And that's not what the statute says.

14   The statute says that he's a danger to the community.  And

15   there are many crimes that are not crimes of violence that can

16   make a person a danger to the community.

17          A person who possess a firearm, it's not a crime of

18   violence, but that person is a danger to the community.

19          A person who breaks into people's homes where they

20   live, residential burglary, is defined as not a crime

21   violence.  However, that makes a person a danger to the

22   community.

23          A person who resists police officers and escapes

24   electronic monitoring is a danger to the community and also a

25   risk of flight.

1    So, that's where I think we disagree on that.  I've

2  never said that those were crimes of violence, and they're

3  not.

4    The Judge disappeared.

5    (Brief pause.)

6    MR. BERRY:  I've never said that those were crimes of

7  violence, and they're not.  But it does make him a danger to

8  the community and a risk of flight.

9    The defendant was on bond.  He was on release when he

10  committed these offenses.  He's had a terrible history of

11  appearing in court.  He's had a terrible history of

12  residing -- excuse me, of actually complying with conditions

13  of release, to the point where he was terminated

14  unsatisfactorily and placed into IDOC custody.

15    Now, when we talk about the history and

16  characteristics of this crime, the defendant -- and as I said

17  in my motion -- him and his co-defendant used cover of a

18  moment in history and went out and committed crimes.  They

19  told you in the video what they were going to do.  Told you

20  they were going to do downtown and commit those -- commit

21  crimes.  And that's what they did.  They went downtown and

22  they lit an unoccupied CTA van on fire.

23    And, yes, the defendant is seen with a lighter at the

24  back of that car.  Him and his co-defendant are seen in the

25  front cab of that van with a flash and a spark where that van

1   is lit on fire.  They're seen holding the doors.  Defendant is

2   throwing cardboard boxes into that.  And they did pose a

3   danger to the community.  It was an eight-minute fire.  And in

4   that eight minutes, there are instances where the fire

5   extended up.  There are instances where the fire extended out

6   towards the building.  Firefighters are fighting that fire and

7   the fire is still raging on.

8          So, yes, that fire, though it was to an unmarked --

9   excuse me, an unmanned CTA van is a danger to the community.

10         As to defendant's risk of flight, as I stated,

11  defendant has not appeared in court previously.  He has shown

12  that he is not a person who can be trusted to appear.

13         Now, counsel talked about this other case of

14  Mr. Fagundo, and I will briefly touch on that.  That (audio

15  transmission interrupted) brought by the government in each

16  district.  And as counsel knows, there are many different

17  things that come into play when you charge an individual.

18  What's the evidence?  Can you say that that's the individual

19  that committed the crime?  There are a bunch of different

20  things that go into play.

21         By charging Mr. Fagundo with that crime, there is in

22  no way anyone saying that there are two different people that

23  are in the same situation but being treated differently.  The

24  evidence is different in both of those cases.  The government

25  charges what they think is appropriate.  That's the job of a

1    prosecutor.  That's what a prosecutor is to do.

2             The evidence in that case was what he was charged

3    with, and that's the reason he was charged with that.

4    Evidence was lacking in other areas, and that's why

5    Mr. Fagundo was charged with what he was charged with.

6             So, there's no ulterior motive or underlying issues

7    here as to the reason why those two were charged differently.

8             Your Honor, I just would end here and I would -- we

9    take the defendant and his co-defendant's words.  And I'm not

10   trying to ascribe anything that the co-defendant stated to

11   Mr. Stewart.  Mr. Stewart is in that video agreeing with

12   certain comments from his co-defendant.  He says he's going to

13   go and grab me some jewelry.  He puts up a facemask; says,

14   facemask (audio transmission interrupted).  He tells you that

15   he is going downtown to do something.  And the defendant --

16             THE COURT REPORTER:  Mr. Berry, excuse me.  This is

17   the reporter.  You're breaking up, sir.  You're breaking up.

18             MR. BERRY:  Okay.  I'll move closer --

19             THE COURT REPORTER:  If you could slow down a little

20   and speak closer to the microphone.  Thank you.

21             MR. BERRY:  Sure.  I will do that.  No problem.  I

22   apologize.

23             Take the defendant at his word, your Honor, as to

24   what he went down there to do.  The defendant is on video

25   setting a fire to a van.  He does face a five-year mandatory

1    minimum.  Nothing has changed from the time that he was

2    ordered detained by Magistrate Weisman to now.  I would submit

3    that a third-party custodian, a person with a high-risk

4    pregnancy is not the individual that should be supervising the

5    defendant to make sure he abides by all the conditions of --

6    any conditions of release that a judge would give.  So, I

7    would say that she is not a suitable third-party custodian.

8           However, it's the government's position that

9    Mr. Stewart should still be detained.  Nothing has changed

10   since his hearing previously.

11          Thank you, your Honor.

12          THE COURT:  All right.  Thank you, Mr. Berry.

13          Mr. Hunter, anything?  Any final words?

14          MR. HUNTER:  Judge, well, I think that there are a

15   few things that Judge Weisman was led to believe that aren't

16   true.  One is that he was on parole, which is just not true.

17   He's not on parole.  He wasn't on parole at the time.

18          With respect to the third-party custodian, we have

19   multiple candidates who we would be happy to submit to

20   Pretrial Services for evaluation of suitability.  We have

21   multiple residences.  If one part of the city is deemed

22   inappropriate, we could put him somewhere else.

23          With respect to the Fagundo situation, I know what

24   the guy pled guilty to.  It's putting a firecracker into a

25   police car.  So, if he pled guilty, presumably that means that

1    the government could prove it.  But, I mean, it's just

2    ridiculous that a white art school student gets that deal and

3    my client is locked up indefinitely for essentially the same

4    thing.  It looks bad.  Maybe there's an explanation for it,

5    but it just -- I think it promotes disrespect for the system

6    when two different people are treated so differently.  And

7    they shouldn't be treated so differently.

8            You know, my client -- when Mr. Berry talks about how

9    he got probation and then he was violated -- he was 17 years

10   old at the time and he was mentally ill.  He got sentenced to

11   boot camp at IDOC, but because of his untreated mental

12   illness, he was denied access to the program and he had to go

13   and serve a long sentence when he was supposed to get out in

14   about 180 days.

15           He's been treated very harshly by the system from the

16   time he was 17 until now, but it's really not been warranted.

17   You can't point to a single person who he's harmed, who's been

18   physically injured by him.  He's not a danger to the

19   community, and therefore I submit he should get out.

20           THE COURT:  Mr. Hunter, what am I supposed to make of

21   all of the violations of probation, failure to appear in

22   court, all of the warrants that had to be issued to ensure

23   Mr. Stewart's presence in court?

24           It just seems like he has a history of not complying

25   with the requirements when he is provided an opportunity to be

1    on pretrial release or probation.

2            MR. HUNTER:  Judge, I would submit that the person

3    who committed those violations is not the person who is before

4    you today.  Most of those occurred when he was a teenager.

5    And I detail in -- at great length in the motion all of his

6    mental problems that he's never really received any adequate

7    treatment for.  So, to say that this mentally ill teenager

8    didn't comply, as opposed to the person who is before you

9    today who is older and, you know, certainly willing and

10   hopeful to receive the proper medication and treatment, I

11   don't think the two things are equivalent.

12           And I also submit, Judge, if we can get him the

13   proper medication and treatment, then his compliance will be a

14   hundred percent.  He wasn't getting and has never had proper

15   medication and treatment.  So, the past compliance is his

16   responsibility, I would agree; but, to a certain extent, I

17   believe that the system contributed to his situation.

18           THE COURT:  What about the fact -- the other factors

19   I have to consider, such as the weight of the evidence against

20   the defendant?

21           I reviewed the videos that the government submitted

22   as part of its response, and the evidence seems pretty weighty

23   with regard to this defendant and the case against him.

24           MR. HUNTER:  Well, I would argue that you can't

25   accept the -- you know, a interested party's representations

1    at face value.  For example, I've seen the video and where

2    Mr. Berry sees a flame, I see what I think is most likely

3    sunlight glinting off of some, you know, shiny object.  I

4    don't think that -- other than pushing a cardboard box through

5    a window, I don't think that there's conclusive proof that my

6    client participated in an arson.  There's some question in my

7    mind if that's really him.  I'm not sure how they're -- you

8    know, exactly how they can establish beyond a reasonable doubt

9    that that person is there, because the video seems to be from

10   far away.

11        But I don't want to argue the evidence.  You know,

12   that's what the trial is for.  But, you know, if we assume

13   that they've got a strong case, that still doesn't mean he

14   should be held in custody.  Lots of people who face strong

15   cases are released.  I would submit that almost every case in

16   federal court is a strong case for the government and if that

17   were the litmus test, nobody would get out.

18        THE COURT:  I was looking at the other video, too.

19   Just the overall activities that Mr. Stewart engaged in and

20   including, you know, trying to basically free one of the Divvy

21   bikes from the stands.  I mean, it seems like he and

22   Mr. Taylor were down during the protests just to create

23   mayhem.

24        And I wonder about the safety of the public when,

25   number one, the counts -- the offense that's charged is a very

1  serious one with a serious mandatory minimum of five years,

2  and then taking that into account, the actions -- at least

3  from the video, what the government attests to be actions by

4  Mr. Stewart and Mr. Taylor on that day when other people, you

5  know, are there peacefully protesting or walking by.

6          MR. HUNTER:  Well, Judge, I would submit that,

7  assuming just for the sake of argument that the people in the

8  video are my client and his cousin, if you look at all of the

9  videos that I've got -- and I'm assuming you have -- there are

10  people breaking into a Foot Locker.  There are people doing

11  all sorts of things.  And it's a unprecedented day.  It's not

12  every day, thank goodness, that we see an eight-minute video

13  of a police officer choking a helpless man to death.

14          And the whole Black Lives Matter movement, the whole

15  civil unrest that went on that day I don't think is likely to

16  be repeated.  And if it's not to be repeated, then I don't

17  think that the anger that boiled over that day, not just for

18  the people around the van, but hundreds of people in the

19  videos, you know.

20          I grant you that protesting -- peacefully protesting

21  -- would have been a better way to go about it.  But all of

22  the people down there were down there as a response to the

23  George Floyd situation.  They didn't go down there a week

24  before.  They didn't go down there a week after.  This was

25  anger boiling over at the system.

1      And, so, because of that anger boiling over at the

2  system based on unprecedented events that occurred just one

3  day, I think you could be confident that it wouldn't happen

4  again.

5           THE COURT:  All right.

6           Mr. Berry, anything to add?  Otherwise, I'm ready to

7  rule.

8           MR. BERRY:  No, your Honor.

9           THE COURT:  Okay.

10          So, on March 17th, 2021, Magistrate Judge Weisman

11  ordered that Mr. Stewart be detained pending trial.

12  Mr. Stewart now asks this Court to review that order pursuant

13  to 18 U.S.C. Section 3145(b).  The review of this Court is de

14  novo.

15          Given the offense that's charged, there is no

16  statutory presumption of detention here.  Accordingly, in

17  order to establish the need for detention, the government must

18  prove:  One, by clear and convincing evidence that no

19  condition or combination of conditions will reasonably assure

20  the safety of the community; and/or, two, by a preponderance

21  of the evidence, that no condition or combination of

22  conditions will reasonably assure the appearance of Mr.

23  Stewart in court during these proceedings.

24          In making this determination, the Court must consider

25  and weigh the factors that are set forth in 18 U.S.C. Section

1    3142(g).  Those factors include the nature and circumstances

2    of the offense that's charged; the weight of the evidence

3    against the accused; as well as the history and

4    characteristics of the defendant, including the character,

5    physical and mental condition, family ties, employment,

6    financial resources, length of residence in the community,

7    community ties, past conduct, history of drug and alcohol

8    abuse, criminal history, and record for appearing in court.

9         I should also consider, whether at the time of the

10   offense or arrest, the defendant was on probation or parole or

11   on release pending trial, sentencing, appeal, or completion of

12   sentence under federal, state or local law; and, finally, the

13   nature and seriousness of danger to any person or the

14   community if the defendant is released pending trial.

15        Here, after considering the totality of the record,

16   the Court finds that the government has established by clear

17   and convincing evidence that no condition or combination of

18   conditions will reasonably assure the safety of the community

19   upon Mr. Stewart's release.

20        Number one, Mr. Stewart is charged with a very

21   serious crime:  Arson under 18 U.S.C. 844(f)(1) and (2).  And

22   that crime has a minimum statutory term of imprisonment of

23   five years.

24        And the government has provided a substantial amount

25   of evidence to support that charge:  The videos of the

1  defendant and defendant's cousin setting the van on fire, as

2  well as defendants taking advantage of the public

3  demonstrations during the Black Lives Matter protests to

4  commit the crimes, as indicated by the various videos that

5  were submitted by the government.

6          Mr. Stewart's criminal history also supports the

7  government's position that he would be a threat to the

8  community if released.  He has been previously convicted of

9  numerous felonies.  And while Mr. Hunter argues that these

10 were all non-violent property crimes, they all indicate a

11 disregard for the community and, the residential burglary

12 conviction in particular, of the willingness to put others at

13 risk.

14         Furthermore, the Court cannot ignore the fact that

15 Mr. Stewart has committed numerous violations of conditions of

16 probation and pretrial release, necessitating the issuance of

17 several arrest warrants.  And he has been convicted of a

18 number of crimes that he committed while he was on parole or

19 pretrial release.

20         So, this, to the Court, demonstrates Mr. Stewart's

21 disregard for the conditions and limitations placed upon him

22 by other courts and indicates significant risk that defendant

23 will disregard the conditions of pretrial release that would

24 be imposed by this Court.

25         Now, Mr. Hunter argues that this was all in the

 1    context of the understandable frustrations that were part of

 2    the demonstrations after the death of Mr. Floyd as part of the

 3    Black Lives Matter demonstration.  But it's clear to me from

 4    the videos that Mr. Stewart did not go downtown in order to

 5    participate in those protests or as a form of protest.  He

 6    went down simply to commit crimes.  And that, to this Court,

 7    is really unacceptable.

 8            Furthermore, with regard to the case of Mr. Fagundo,

 9    here, if the government proves its allegations as the videos

10    indicate, Mr. Stewart and his cousin set fire to a van; and,

11    that resulted in serious fire damage, as well as the need for

12    the fire department to come and put out the fire, which was in

13    the middle of a public street here in Chicago.  So, those

14    actions seriously put the community at risk.  And I believe

15    that the charge that the government charged in this case

16    reflects that.

17            Furthermore, the Court finds that Mr. Stewart's

18    history of ignoring parole and pretrial conditions also

19    demonstrates that no condition or combination of conditions

20    would be able to reasonably assure his future attendance in

21    these proceedings and compliance in this case.

22            Now, I understand that Mr. Stewart has suffered from

23    various mental conditions, but those conditions can and will

24    be treated by the relevant personnel at the MCC during his

25    detention.

1       Furthermore, with regard to Mr. Hunter's arguments

2   that the conditions at the MCC are not safe because of COVID,

3   the MCC has undertaken massive efforts to vaccinate its

4   officers, employees, as well as current inmates.  And the

5   current statistics at this point indicate that the risk of

6   contracting COVID as an inmate there are low compared to prior

7   months and prior times.  I understand from Mr. Hunter that

8   Mr. Stewart has asthma, but, again, it is relevant that he has

9   had no need to take medication for that asthma in the last

10  year and appears that his symptoms are mild.

11      Furthermore, given Mr. Stewart's young age, I do

12  think that the risks of him contracting COVID and being

13  seriously ill because of contracting COVID are extremely low.

14      For all those reasons, the Court agrees with

15  Magistrate Judge Weisman and finds that the government has

16  satisfied its burden to prove by clear and convincing evidence

17  that no condition or combination of conditions will reasonably

18  assure the safety of the community.  And the Court further

19  finds the government has shown by a preponderance of the

20  evidence that no condition or combination of conditions will

21  reasonably assure Mr. Stewart's appearance in this case.

22      Accordingly, Mr. Stewart's motion brought by his

23  counsel is denied.

24      Is there anything else that I need to address for the

25  government today?

22

1          MR. BERRY:  No, your Honor.

2          THE COURT:  Mr. Hunter, anything else for Mr.

3   Stewart?

4          MR. HUNTER:  No, Judge.

5          THE COURT:  All right.  Thank you.  We're adjourned.

6                    *    *    *    *    *

7

8   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
9

10
    /s/ Joseph Rickhoff                    June 6, 2022
11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25