UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff. | ) | Case #: 21 CR 105 | |
| | ) | | |
| v. | ) | | |
| | ) | The Hon. Gary S. Feinerman | |
| LAMAR TAYLOR, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**DEFENDANT LAMAR TAYLOR'S CORRECTED COMBINED OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT & SENTENCING MEMORANDUM**

NOW COMES the Defendant, **LAMAR TAYLOR**, by and through his attorney, ANTHONY J. SASSAN, and as his Combined Objections to Pre-Sentence Investigation Report ("PSR") and Sentencing Memorandum, states as follows:

I.      Overview of Sentencing Request

Lamar Taylor has plead guilty to one count of conspiracy to commit arson in violation of 18 U.S.C. §371 and one count of civil unrest in violation of violation of 18 U.S.C. §231(a)(3). Specifically, Lamar has plead guilty to planning and assisting in the lighting of an unmanned CTA maintenance van on fire during the George Floyd protest. The van was in flames for approximately eight (8) minutes before the fire department arrived and extinguished the flames. Fortunately, the fire did not spread, the van did not explode, and no injuries resulted from the fire.

Lamar is 25 years of age, has a five (5) year old son with whom he is actively involved his son's life, has minor criminal history, and has been in custody since his arrest for this case on February 24, 2021. When he was approximately sixteen (16) years of age, Lamar personally witnessed Chicago Police Officers shoot and kill his brother in a case of mistaken identity. (A copy of the March 29, 2014, Chicago Tribune article "*Cops Fatally Shoot Man Who Allegedly Pointed Gun at Them*" is attached hereto and incorporated herein as Exhibit "A"). Lamar was in the vicinity of his brother and personally observed when he was shot and killed by the police officers. While he did not previously receive any therapy for the effects of the above incident, it has had a profound effect on Lamar. In addition to the profound

emotional effects, Lamar no longer trusts police officers, and believes that Caucasian police officers do not respect and have no hesitation about killing African Americans.

The murder of George Floyd was one in a line of inexplicable, racially charged publicized incidents where African Americans were killed by Caucasian law enforcement officers. Moreover, this incident occurred at the George Floyd protests taking place in downtown Chicago at the height of this emotionally charged time.

In sentencing Lamar, the court is not bound to impose a mandatory minimum sentence. Lamar advisory sentencing guideline range is either 41 to 51 months[1] or 37 – 46 months[2] based on an adjusted offense level of 21 and Criminal History Category of I or II. The Probation Department has calculated Lamar advisory sentencing guideline range at 41 – 51 months and has recommended a sentence of 38 months. Lamar is requesting a sentence of twenty-two (22) months.

## II.  Sentencing Guideline Calculations

Lamar objects to the Criminal History Calculation of II set forth in the PSR, and believes that his accurate Criminal History Category is I.

Lamar objects to the one criminal history point given in ¶41 of the PSR for a juvenile adjudication of delinquency in Cook County case number 15 JD 02119 pursuant FSG §4.1(c) because the juvenile adjudication related to an act committed by Lamar prior to his turning eighteen of age and more than five years before the conduct leading to the instant case. (May 30, 2020). Consistent with the Plea Agreement, Lamar should have only two criminal history points placing him in Criminal History Category I.

Based on the discrepancy between the Criminal History Categories, Lamar objects to the advisory sentencing guideline range and calculation contained in the PSR of adjusted offense level of 21 and Criminal History Category of II resulting in an advisory sentencing guideline range of from 41 – 51

---

[1] Presentence Report.
[2] Plea Agreement

months and argues is the correct advisory guideline range is set forth in the Plea Agreement of 37 to 46 months.

### III.   Objections to Pre-Sentence Report

Lamar objects to the portion of ¶35 of the PSR asserting that he stole merchandise from the camera shop on the date of the incident.  Lamar did not take merchandise from the camera shop on the date of the incident, was not present and did not take part in setting the camera shop on fire.

### IV.   Factors Pursuant to 18 U.S.C. 3553

It is well established that the Federal Sentencing Guidelines (FSG) are not mandatory.  *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005).  Considering the above, a sentencing judge must use the correct calculation of the sentencing range while considering the facts contained in the PSR and arguments asserted by defense "without any thumb on the scale favoring a guideline sentence" when rendering his sentence. *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007).  In other words, while the sentencing judge is to consider the suggested guideline range, the FSG are not to receive preferred status to the other sentencing factors set forth in 18 U.S.C. § 3553(a).  *Booker*, 543 U.S. at 245-46.

In this regard, the Supreme Court has further stated that the FSG "are the starting point and initial benchmark but are not the only consideration."  *Gall v. United States*, 128 S.Ct. 586 (2007), *citing Rita v. United States*, 127 S.Ct. 2546 (2007).  After permitting both parties to argue for a particular sentence, the sentencing judge should consider all the § 3553(a) factors[3] in crafting a sentence. *Id.*  Critically, § 3553(a) requires a

---

[3] Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."  Section 3553(a)(2) states that such purposes are:
    (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) To afford adequate deterrence to criminal conduct;
    (C) To protect the public from further crimes of the defendant; and
    (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
Section 3553 (a) further directs courts to consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

sentencing judge to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." *United States v. Kimbrough*, 128 S.Ct. 558, 564 (2007).

Consequently, the sentencing judge has considerable discretion to individualize the sentence to the offense and offender if the judge's reasoning is consistent with the factors set forth in § 3553(a). *United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007). To this end, the *Kimbrough* Court held as follows:

> This Court's remedial opinion in *United States v. Booker*, 543 U.S. 220, 244 (2005), instructed district courts to read the United States Sentencing Guidelines as "effectively advisory," *id.*, at 245. In accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence. *Booker* further instructed that "reasonableness" is the standard controlling appellate review of the sentence district courts impose. A district judge must include the Guideline range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is "greater than necessary" to serve the objectives of sentencing. 18 U.S.C. § 3553(a) (2000 ed. and Supp. V).

*Kimbrough*, 128 S.Ct. at 564.

In *United States v. Rita*, 127 S.Ct. 2456 (2007), the Supreme Court set forth the blueprint for the post-*Booker/Kimbrough* sentencing analysis. Here, the *Rita* opinion noted that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. However, the Guidelines are not the only consideration. Accordingly, after both parties have argued for whatever sentence, they deem applicable pursuant to the Guidelines, the sentencing judge should then consider all the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, the sentencing judge is not to presume that the Guidelines ranges are reasonable. Instead, the sentencing judge must make an individualized assessment based on the facts presented. If the sentencing judge believes that an outside-Guideline sentence (variance) is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, the sentencing judge must adequately explain the chosen sentence to allow for meaning full appellate review and to promote the perception of fair sentencing. *Id.*

A court determining the appropriate sentence "must not presume that a within-Guidelines sentence is reasonable but must apply the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence that is 'sufficient, but not greater than is necessary.'" *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). *See also United States v. Page*, 611 F.3d 397 (7th Cir. 2010) (upholding below guideline sentence based on meaningful consideration of § 3553(a) factors in case involving four bank robberies and a high-speed chase).

A. LAMAR TAYLOR's Individual History & Characteristics Along
With Nature & Circumstances of the Offense

The PSR summarizes Lamar's difficult childhood which began at birth when his biological mother abandoned Lamar and his twin brother, Lamont Taylor, at the hospital immediately following their birth. Lamar and his brother were taken in and raised by his great aunt (Margaret Kerr). When he was approximately eighth (8) months old, Lamar's mother legally relinquished custody of him and his twin brother to his great aunt who then raised him, and his twin brother along with six other children. Lamar never met his father and has had only extremely limited contact with his biological mother.

Lamar grew up in and lives in Chicago's Roseland neighborhood which is a neighborhood with a large gang presence, a large concentration of shootings and other crime, and a neighborhood with little opportunity for success through legal means. Despite the best efforts of his great aunt, Lamar's childhood was lacking in attention as well as basic needs due to his great aunt's financial limitations. Moreover, Lamar was exposed to his great aunt being the victim of physical and emotional abuse who also struggles with alcoholism. The PSR summarizes how Lamar, and his brother would have to wear whatever clothing was passed down and available and rarely received new cloths. As a result, the cloths they wore to school were often ill-fitting or unmatched and subjected them to ridicule from other students. Despite Lamar's great aunt's inability to afford extra-curricular activities for Lamar and his brother to participate, Lamar developed an interest and talent in repairing bicycles, scooters, and eventually cars and trucks.

When Lamar was sixteen (16) years of age a series of traumatic events occurred that serve as a partial explanation for his actions in the instant case as well as his prior conviction for battery. On

March 29, 2014, Lamar's older brother, Reason Shaw, was shot and killed by Chicago Police Officers while Lamar watched from a porch. (Exhibit "A"). While Lamar had not grown up with his older brother, he had remained in contact with him and had a relationship with him. Coupled with the uneasy relationship the Chicago Police Department has with citizens of the Roseland neighborhood, witnessing the killing of his brother by Chicago Police Officers was an extremely traumatic event and reinforced Lamar's mindset that the police did not care about the citizens it was supposedly there to serve and protect. A couple of months after the Chicago Police officers shot and killed his brother, Lamar was the victim of a shooting as he was going to a friend's house. During this incident, the friend Lamar was with was killed and Lamar suffered three gunshot wounds.

Here, the PSR fails to connect these events with the beginning of Lamar's feelings of what he describes as depression (and other symptoms consistent with PTSD) beginning at around sixteen years of age with the witnessed shooting death of his brother and murder of his friend a couple of months later. Lamar's feelings of depression were confirmed by his brother during his interview for the PSR. (PSR at p. 21, ¶85). Additionally, prior to ending their relationship, Lamar's former girlfriend (Erykah Lee), who had been friends with Lamar since they were children, described to Lamar's attorney that Lamar's personality changed after the police killed his brother and his friend was murdered. Ms. Lee specifically described the changes as Lamar becoming angry (particularly at the police), nervous, paranoid, afraid when going outside, jumping at sudden, loud noises, and experiencing ongoing nightmares. It is also at around sixteen (16) years of age that Lamar began self-medicating with alcohol and experimenting with marijuana and ecstasy. While his use of marijuana and ecstasy was relatively short-lived, Lamar's abuse of alcohol increased to the point where he was consuming a fifth of liquor daily, including the day of the incident. Additionally, Lamar attempted suicide on one occasion and had suicidal ideations on several other occasions. While Lamar had never received mental health treatment or therapy for the trauma he witnessed, it is not a stretch to conclude that both the killing of Lamar's brother by police and the subsequent murder of his friend a couple of months later triggered an untreated emotional condition which has manifested itself in anger/distrust towards the police and other authority, anxiety, alcohol

abuse/dependence, and defiant behavior towards police and authority.   Based on this background and the information provided by the MCC contained in the PSR, it is disturbing that Lamar has not received any therapy during this period of pretrial detention.  As part of any sentence imposed in the instant case, Lamar is requesting a mental health evaluation and to begin with the recommended therapy so he will be able to address the effects of the above-described traumatic events.

At the time of the incident, Lamar had been in a committed relationship with Erykah Lee, with whom he had been friends since childhood.  Lamar and Ms. Lee have a five-year-old son together.  Prior to his arrest in the instant case, Lamar had been actively involved in his son's life daily providing for him not only financially, but also in caring for him.  Despite Lamar's seven-year relationship with Ms. Lee ending in October 2021, while he was in custody for this case, he has kept in constant contact with his son.  Lamar realizes the importance of being a positive influence in his son's life and desires to do so.  When speaking with Probation, Lamont Taylor described Lamar as "a very good father" who "goes above and beyond" for his son.  Lamont Taylor also noted that Lamar's son misses him greatly.

Throughout the proceedings on this matter, the government has highlighted the Facebook Live video stream posted by Lamar as he, Mr. Stewart and Ms. Lee drove downtown.  In the video stream, Lamar spoke of going downtown to protest and steal items from stores.  However, Lamar did not speak of starting any fires or confronting the police.  Here, a certain portion of Lamar's livestream constitutes "bravado", exaggerated speech to spark interest in his live feed.  In this regard, a 2014 survey of social-media users revealed that two-thirds of social-media lie or exaggerate to "airbrush reality" and make their lives seem more interesting.  (A copy of Calman, Barney, "*Fibbing on Facebook Can Trick Your Memory: People Start Believing Their Own Social Media Exaggerations*", Daily Mail.com (December 27, 2014) is attached hereto and incorporated herein as Exhibit "B").   Additionally, subsequent Facebook live streams from Lamar revealed that he avoided those areas of the protest that appeared too intense, or which could result in police confrontation with the demonstrators. (A copy of the Live Feed from Lamar Taylor's Facebook page are attached hereto and incorporated herein as Exhibit "C").  As such, the government's anticipated

position that Lamar went downtown on the day of the George Floyd protest to start a fire or create mayhem other than possibly to steal some items overstates Lamar's intent.

Moreover, Probation's statements minimizing the effect of Lamar's witnessing his older brother being shot and killed by Chicago Police[4] demonstrates a complete inability to relate to not only the trauma of witnessing a relative being shot [in the back] and killed by police, but also a complete lack of empathy for the feelings towards the police and other authority of a young African American male who grew up and spent is life in Chicago's Roseland neighborhood. Initially, the PSR mis-states the effect of the death of Lamar's brother on the incident. It was never Lamar's position that he went to the protest because the Chicago Police shot and killed his brother in front of him. It is counsel's position that the traumatic effect of Lamar's witnessing the killing of his brother by police, coupled with the extreme emotions tied to the murder of George Floyd by police and the emotion of the protest likely contributed to his rash decision to light an unmanned CTA van on fire. Moreover, a review of the video surveillance of the CTA van reveals that by the time Lamar and his friends arrived at the location of the CTA van, several other people had already broken into the van, damaged the van, and stolen from the van. This activity likely heightened the extreme impulse for Lamar and Mr. Stewart to join in and do something to the CTA van. It is near impossible for one who is not African-American, did not grow up in a neighborhood such as Roseland, who did not witness police shoot and kill a relative, and have a friend subsequently shot and killed in a drive-by shooting to understand the effect that would have in an environment that existed in the wake of the George Floyd murder (which again, was one in a long line of highly publicized white police officer on black victim killings).

Furthermore, to minimize the effect of the above events on Lamar's taking part in the instant offense based on comments he made on the Live Stream on the way downtown demonstrates a lack of understanding of PTSD triggers. Specifically, the above-described situation that existed when Lamar

---

[4] Sentencing Recommendation at p.3. ("Defendant Taylor appears to suggest that he involved himself in the protests due to his maternal half brother's death, which was apparently caused by law enforcement; however, it is also noted it does not appear he was particularly close to that brother. Furthermore, most of his video focused on wishing to steal items during the unrest, as opposed to the singular mention of his brother.").

arrived at the location of the CTA Van could have been the trigger to get him to act as opposed to the situation of simply driving downtown.

Moreover, Probation failed to consider the subsequent Facebook live feed[5] posted by Lamar when he and his friends were downtown at the protest which clearly demonstrates his desire to avoid any confrontation with police. (Exhibit "C"). The subsequent Facebook live feed contradicts the bravado statements made by Lamar in the Facebook live feeds from his drive downtown.

Finally, the PSR and Sentencing Recommendation fail to link the obvious connection between the killing of Lamar's brother and the murder of his friend with his beginning to use alcohol (and to some degree drugs) to self-medicate despite the confirmation from Lamont Taylor that the events that Lamar went through "took a toll" on him.

By addressing the emotional effects of his brother's death and the murder of his friend, and addressing the Facebook live feeds, Lamar is not attempting to provide an excuse for his actions or avoid responsibility. Instead, those arguments are included herein to emphasize that Lamar's actions on the day in question were influenced by the heightened emotions of the time coupled with his emotional health and are not an accurate representation of the person Lamar is and will be once his emotional issues are properly addressed. Consequently, there is a lower likelihood that Lamar will reoffend or commit this type of crime again.

In addition to the comments by Lamont Taylor to probation, attached is a letter of support from Kayla Wheeler who describes Lamar as a good, dedicated employee who works with a positive attitude, a loving and involved father to his son, a caring and generous person to others, and who is attempting to address those feelings which create negative energy in his life so he can be a more productive and happier person. (A copy of the letter of support from Kayla Wheeler is attached hereto and incorporated herein as Exhibit "D").

---

[5] Exhibit "C".

Finally, counsel is in the process of addressing the outstanding warrants and pending Cook County cases. Counsel anticipates having all warrants quashed and likely all cases resolved by the time Lamar is assigned to any Bureau of Prisons facility.

Considering the above, Lamar Taylor's personal characteristics, background and traits would support the appropriateness of a sentence below the advisory guideline range. *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011) (holding that the sentencing court's failure to consider evidence explicitly required by § 3553(a) (i.e. characteristics of individual) constituted a failure in the court's duty to impose a sufficient sentence, but one that is not greater than necessary); *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2007) (holding that a District court's "freedom to impose a reasonable sentence outside the range is unfettered"), *United States v. Vaughn*¸ 433 F.3d 917, 924 (7th Cir. 2006) (noting that the Seventh Circuit will scrutinize a district court's refusal to "depart from advisory sentencing range).

### B. A Sentence of Twenty-Two (22) Months Would Avoid an Unwarranted Sentencing Disparity with Co-Defendant, Denzal Stewart's 45-Month Sentence and Sentences Imposed on Other Defendants Charged with Arson, Conspiracy to Commit Arson or Obstruction Arising from the George Floyd Protests

A below – guideline sentence of a sentence of twenty-two (22) months for Lamar Taylor would avoid an unwarranted sentencing disparity with his co-defendant Denzal Stewart's sentence of 45 months due to their comparable roles in the offense, and Mr. Stewart's more extensive criminal history as well as avoid an unwarranted sentencing disparity with other individuals sentenced for similar conduct arising from the George Floyd protests. (18 U.S.C. § 3553(a)(6)). The court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall*, 552 U.S. at 55 ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among

defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

In the instant case, Lamar Taylor's co-defendant Denzal Stewart received a sentence of 45 months based on an adjusted offense level of 21 and Criminal History Category of V resulting in an advisory sentencing guideline range of 77 to 96 months. In this regard, Lamar Taylor's criminal history category is lower than Mr. Stewart's and Lamar Taylor's prior convictions were based on the less violent offense of battery whereas Mr. Stewart's criminal history category of VI includes prior convictions for residential burglary, possession of stolen motor vehicles and escape. Moreover, prior to the instant case, Lamar Taylor has never received a sentence including a jail/prison term and has already served approximately 22 months in the instant case. Generally, sentencing should be incremental, starting with the lower sentence for a first offense. *See United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005) (Aldeman, J.) This is consistent with 18 U.S.C. § 3582's mandate that the District Court is required to "recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation." (18 U.S.C. § 3583). Other research has concluded that "according to the best available evidence * * * * prisons do not reduce recidivism more than non-custodial sanctions." Cullen, Francis T., et al., *Prisons Do Not Reduce Recidivism: The Hight Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Additionally, following is a breakdown of the sentences received by other individuals for similar charges nationally:

| Defendant | Guideline Range | Sentence Received | Description |
|---|---|---|---|
| *United States v. Timothy O'Donnell* (aka "Joker") (N.D.IL 21 CR 260) | 41-51 months | 34 mo. | Defendant set a Chicago Police squad car on fire. |
| *United States v. Jacob Fagundo* (NDIL 21 CR 195) | 8-14 months | 3 yrs. probation | Civil disorder |
| *United States v. James Massey* (NDIL – 21 CR 142) | 24-30 months | 15 mo. | Inciting a riot, and participating in, and carrying on a riot |
| *United States v. Bryce Michael Williams, et al.* (D MN) | 37-46 months | Bryce Michael Williams = 27 mo. | Conspiracy to Commit Arson. Defendants attempted to burn down a police station. |

| | 41-51 months | Davon De-Andre Turner = 36 mo. | |
| | 41-51 months | Dylan Shakespeare Robinson = 23 mo. | |
| | 37-46 months | Branden Michael Wolfe = 41 mo. | |
| *United States v. Samuel Frey, et al.* (D MN – 20 CR 129) | 37-46 months | Samuel Frey – 27 mo. | Defendants set fire to store in Minnesota and Frey advised codefendants to lie about it to law enforcement. |
| | 6-12 months | McKenzy Dunn – 3 yrs., Probation | |
| *United States v. Newbins, et al.* (D Utah – 20 CR 182) | 27-33 months | Latrol Newbins – 13 mo. | Defendants set a police car on fire. |
| | 27-33 months | Lateesha Richards – 20 mo. | |
| | 37-46 months | Jackson Patton – 24 mo. | |
| | 21-27 months | Larry Williams – 24 mo. | |
| | 21-27 months | Christopher Rojas – 13 mo. | |
| | | | |

In the instant case, a sentence of twenty-two months for Lamar would avoid unwarranted sentencing discrepancies between his co-defendant Stewart as well as other defendants charged with similar offenses arising from the numerous George Floyd protests that took place throughout the country. First, Lamar's criminal history category of either I or II is significantly below that of co-defendant Stewart's criminal history category of V, and Stewart's 45-month sentence constituted a significant below-guideline sentence. Moreover, co-defendant Stewart's sentencing brief did not indicate that he was personally affected by the type of traumatic experience involving the police as was Lamar. As such, Lamar's traumatic experience with the Chicago Police coupled with his significantly less severe

criminal history would support a 22-month sentence and be consistent with the length and below-guideline sentence received by co-defendant Stewart.

Second, other than Timothy O'Donnell (aka "Joker"), it does not appear that any of the other defendants listed above had the type of traumatic experience involving the police as did Lamar. In this regard, the proposed sentence of 22 months falls within the average sentence imposed on the other defendants listed above.

Third, each of the defendants described above received sentences that were significantly below their advisory guideline range.

C. <u>LAMAR TAYLOR Has a Re-Entry Plan & Family Support</u>

Lamar's re-entry plan, family support and indication of self-rehabilitation would further support a below-guideline sentence of 22 months. While Lamar's family support group is not large in numbers it is significant in quality. Lamar's plan would involve his living with his twin brother, Lamont, upon release from custody. Lamar's brother has no criminal history and has a strong history of employment. The two have remained close throughout their lives and have cared for each other. Lamont would provide a strong, positive example for Lamar to follow upon his release from custody. Moreover, Lamar and Lamont have confirmed their plan to work together as truck drivers upon Lamar's release from custody and reinstatement of his CDL.

Lamar has already begun to prepare himself for a meaningful career after he is released from custody by successfully completing the classes "How to Market Yourself" and "Managing Credit Wisely" while in the MCC. (Copies of Lamar's Certificates of Completion for "How to Market Yourself" and "Managing Credit Wisely" are attached hereto and incorporated herein as Exhibit "E" and "F"). Additionally, Lamar has worked in the food service department of the MCC and has been recognized for his exceptional work and leadership in food service. (A copy of Lamar's Certificate of Accomplishment is attached hereto and incorporated herein as Exhibit "G").

Next, Lamar's statement described in his PSR demonstrates a certain level of self-rehabilitation. Specifically, Lamar explained in his Presentence Investigation Interview that:

> [P]rior to his detriment, he felt as if he did not have anything for which to live, but he now 'want[s] to be something'." He related he wishes to make positive changes in his life and be more like his twin brother. The defendant advised he has eaten healthier since his detainment and has not experienced any changes to his sleeping habits.
>
> In regard to his future goals, the defendant indicated he wishes to find a job and work his way up. He noted he would eventually like to purchase a tow truck and start his own business. The defendant reported he wishes to purchase a home, care for his family, and eventually leave the Chicago, Illinois area.

(PSR at p. 22, ¶¶ 89-90).

Finally, Lamar has expressed his understanding of the importance and desire to be present and involved in his son's life, as well as his understanding of the loss his son has experienced during the period that Lamar has been in custody in this case.

Lamar Taylor's expressions of remorse as set forth above, acknowledgement of the negative effects his conduct has had on his loved ones, including his son, and are strong indications that he has made significant steps towards self-rehabilitation and is not likely to reoffend. *United States v. Williams Martin*, 718 F.3d 684 (7th Cir. 2013) (finding reversible error for the court not to have considered self-rehabilitation evidence and recidivism issue); *United States v. Love, et al.*, 680 F.3d 994 (7th Cir. 2012).

### D. Unduly Harsh Pretrial Detention

Lamar Taylor's pretrial detention experience in the MCC since the COVID-19 pandemic outbreak in March 2020, is unlike that which few other defendants have experienced. Since March 2020, it has become clear that those housed in our jails are not safe from the virus, and likely face an even greater danger than the public due to the confined space.

A below-guideline sentence in the instant case is properly within this Court's discretion because Lamar Taylor's pretrial detention at the MCC has been unduly harsh due to the outbreak of the COVID-19 pandemic. Lamar having contracted COVID-19 in December 2021, the extent to which the MCC was affected by the virus, the resulting extended lock-down, and the ban on family visits that were implemented as safety precautions to combat the spread of COVID-19 all impacted his detention. In the nearly two and a half years of the pandemic, there have been extended periods of time where the inmates

have not been allowed to shower, have not been able to exercise, have not been able to have phone calls with family, and have been confined to their cells.

The precautions implemented at the MCC during the pandemic coupled with Lamar's having contracted COVID-19 in December 2021 constitutes unduly harsh pretrial conditions that this court can consider as a basis for a below-guideline sentence.

E. A Sentence of Twenty-Two (22) Months Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense as well as Afford Adequate Deterrence to Criminal Conduct and Would Protect the Public from Further Crimes of the Defendant

Consideration of the above §3553(a) factors, a sentence of twenty-two (22) months would reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence to criminal conduct, protect the public from further crimes of Lamar which is no greater than necessary to provide just punishment for the offense.

### III. RECOMMENDED CONDITIONS OF SUPERVISED RELEASE

Lamar objects to proposed **Discretionary Condition #6**, the prohibition of him having any contact with Denzal Stewart while on supervised release. Mr. Stewart is Lamar's cousin and the two are close and have spent much of their lives together. Moreover, the two might also attend the same significant family events.

Lamar objects to proposed **Discretionary Condition #7**, prohibiting the use of any alcohol while on supervised release and requests that the condition be modified to "any excessive use of alcohol."

Lamar objects to the portion of proposed **Discretionary Condition #16** that would require him to allow probation's visits of him "at work" as, despite Probation's best efforts, visiting him at a job might place his job in jeopardy and disrupt his ability to make a living.

## V. CONCLUSION

Based on the above, Lamar Taylor requests that the Court exercise its discretion pursuant to 18 U.S.C. 3553(a) and impose a sentence of twenty-two months with credit for time served since February 24, 2021, with three (3) years of supervised release.

Respectfully Submitted,

/s/: *Anthony J. Sassan*
On behalf of the Defendant, Lamar Taylor

Anthony J. Sassan (#6216800)
SASSAN & SASSAN, LLC
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601
(312) 977-9050
ajs@sassanlaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff. | ) | Case #:  21 CR 105 |
| | ) | |
| v. | ) | |
| | ) | The Hon. Gary S. Feinerman |
| LAMAR TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

PLEASE TAKE NOTICE that, prior to 11:59 p.m., on the 7th **day of December 2022**, the undersigned served to the attorneys of record a copy of the **Defendant, LAMAR TAYLOR's Corrected Combined Objections to Pre-Sentence Investigation and Sentencing Memo with Exhibits** *via* mail via the Northern District of Illinois E-Filing system to each person to whom it is directed on the attached Service List on said date.

/s/ *Anthony J. Sassan*

Anthony J. Sassan (#6216800)
SASSAN & SASSAN, LLC
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601
(312) 977-9050
ajs@sassanlaw.com