UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 21 CR 105 |
| v. | ) | |
| | ) | The Honorable Gary S. Feinerman |
| LAMAR TAYLOR | ) | |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

We fittin' to go down here to get busy, like everybody else. Cuz, we about to go down here and get buckwild like everyone else.

I'm trying to hit a lick. No justice, no peace [expletive].

I'm trying to get that $50,000 Rolex … I'll be the one to throw the brick through that [expletive].

I'm really down here for the bull[expletive] too though.

We come down here ready to catch a [expletive] case. I don't give no [expletive].

- Lamar Taylor on Facebook Live on May 30, 2020

On May 30 ,2020, those were the defendant's words to anyone watching on Facebook Live while he was on his way to downtown. While many were converging in downtown Chicago to peacefully protest the Minneapolis murder of George Floyd, Lamar Taylor was on his way downtown to "act an ass." While downtown, amongst other things, Taylor set an unattended CTA van on fire and took part in turning a legitimate protest into a night of looting and violence.

For his actions and pursuant to the 3553(a) factors, the government is requesting a sentence within the advisory guidelines range of 41 to 51 months'

imprisonment, to be followed by three years of post-release supervision and the mandatory $200 special assessment.

## I.     PRELIMINARY ADVISORY SENTENCING GUIDELINES RANGE

As a matter of process, the district court must properly calculate the Guidelines range, treat the Guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the Guidelines range. *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).

The government agrees with the Probation Office's determination that the base offense level is 24, pursuant to Guideline § 2X1.1(a) and 2K1.4(a)(1), because the defendant knowingly created a substantial risk of death or serious bodily injury to another person other than a participant in the offense. PSR at ¶¶ 16, 20.

The government also agrees that the defendant has accepted responsibility in a timely fashion and receives a three-point reduction to his offense level pursuant to Guidelines §§ 3E1.1(a) and (b). PSR at ¶¶ 32-33.

Finally, the government agrees with the Probation Office that defendant's criminal history points equal 3 and place him in Category II. PSR at ¶¶ 40-43.

Defendant objects that his criminal history category is II. He states he should not receive one criminal history point for the juvenile adjudication he received under Cook County case 15 JD 02119 because it has been more than five years between the adjudication and the commission of this act. Defendant is wrong.

Pursuant to USSG § 4A1.2(d)(2), for an offense committed prior to the age of eighteen, one point is added for each juvenile sentence imposed within 5 years of the defendant's commencement of the instant offense.

In this instance, on December 16, 2015, the defendant was adjudicated delinquent in Cook County case 15 JD 02119. PSR at ¶ 41. The arson of the CTA van and civil disorder took place on May 30, 2020, clearly within five years of the juvenile adjudication, a proposition with which the defendant agreed to in his plea agreement. Defendant does not object to the two points for his August 20, 2020 plea to battery in Cook County.

Accordingly, the calculations put forth by Department of Probation are accurate. The defendant's total offense level is 21, his criminal history category is II (3 criminal history points), and his advisory Guidelines range of imprisonment is 41 to 51 months. PSR at ¶ 115. The government also agrees that the Court may impose a period of supervised release of up to 3 years. PSR at ¶ 119.

## II. GOVERNMENT'S POSITION ON SENTENCING

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The "Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see also United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). Although a sentence within the Guidelines is presumptively

reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence.

For the foregoing reasons, the government respectfully submits that a sentence within the applicable Guidelines range of 41 to 51 months' imprisonment is warranted in this case and most appropriately reflects the nature and circumstances of defendant's offense, his history and characteristics, the need to afford adequate deterrence, and promote respect for the law.

## A.   The Nature and Circumstances of Defendant's Crime

The defendant's crime was extremely serious. In the midst of non-violent protests, defendant and his cohorts set a CTA van on fire, seeking to turn the night into one of mayhem. In fact, defendant told anyone that was listening on Facebook Live why he was headed downtown. He did not care about the actions of a police officer in Minnesota. He only sought to find a way to enrich himself.

One can see why the defendant is now seeking to create distance between himself and the video he posted online, while he was on his way downtown. Though he claims that the video was only "'bravado' [and] exaggerated speech to spark interest in his live feed," it was much more. In that video, defendant made a mockery of an historic event and let the world know that he was there to "protest for a Rolex."

Throughout his approximately 18-minute video, while riding downtown wearing a ski mask (which he took off after a while, showing his face) and white plastic gloves, the defendant talked about "trying to hit a lick," "throw[ing] a brick"

4

through a window, "trying to get that $50,000 Rolex," wanting to "get some of this free [expletive]," "getting some of that money that they giving out down there," "just going down [there] for the bull[expletive]," "try[ing] to act an ass," and "coming down here ready to catch a [expletive] case."

Even though he made all the above-mentioned statements, one of the most egregious things the defendant stated was that he was going downtown to "protest" while using his hands and fingers to make quotation marks, as to say that he was being sarcastic. He found joy in his joke that he was going to "protest for a Rolex." Additionally, not one time, did he mention George Floyd or the murder that took place in Minneapolis. To now try to claim that he was "airbrush[ing] reality" or that the government or probation are overstating the defendant's intent is disingenuous and an abdication of his acceptance of his actions.



While downtown, defendant and his codefendant Stewart arrived around Pritzker Park and kicked a Divvy bike station until they were able to set one bike free, giving it to his girlfriend to ride around on for the rest of the night. After this, defendant and Stewart happened upon the parked, unattended CTA van in the middle of State Street. Though things had not yet escalated, defendant and his codefendants decided to set fire to the van.



STEWART                                                          Small Flame

In the picture above co-defendant Stewart is lighting a fire in the back of the
CTA van.



STEWART               TAYLOR                Fire

In the picture above, defendant Taylor is inside the front passenger
compartment of the van. While in there, a flash of fire is seen. Co-defendant Stewart
is standing behind defendant Taylor watching him.



STEWART                                    TAYLOR

The above picture comes after defendant Taylor was in the front passenger compartment of the van, setting a fire. After the fire is seen (picture above this one), defendant Taylor exited the van and ran around the van, closing all the doors.



STEWART

In the picture above, co-defendant Stewart is about to put a cardboard box, that he found on the ground, into the front passenger compartment of the CTA van, ostensibly to assist the growth of the fire.





The two pictures above show the CTA van on fire. The first picture is when the flames first appeared. The second picture shows people walking by the van on fire.



The picture above is after approximately eight minutes of the CTA van burning. Firemen came to the scene to put out the fire. The CTA van was destroyed.

While the van was on fire, small explosions and sparks were seen, exposing the firemen and other individuals in the area to danger. Taylor's actions put scores of people at risk, including police officers, firefighters, protesters, and bystanders; he interfered with law enforcement officers trying to protect the public at a time when their services were critical; he caused thousands of dollars in damages; and his actions served as some of the images and stories that tarnished this city.

Thankfully, no one was injured as a result of the fire the defendant and his codefendants set. Defendant knew what he was doing was dangerous and could hurt others. Despite the obvious risks his actions posed to others, defendant did it anyway. Only by sheer luck was no one injured, but it could have been very different.

Accordingly, the nature and circumstances of defendant's offense coupled with eh ill intent shown in his Facebook Live video, warrant a sentence of imprisonment within the guideline range of 41 to 51 months.

## B. Defendant's History and Characteristics

Defendant is a 25-year-old father of a five-year-old son. PSR ¶ 74. Defendant reported growing up in a "bad neighborhood" and being cared for by an alcoholic grandmother (contrary to his brother's perception of their grandmother during their childhood). PSR ¶¶ 69-70, 75, 88.

Though he denied any domestic violence by claiming the victim was lying, the police were called by his child's mother on a claim of physical abuse where the police saw redness and swelling on defendant's child's mother's face. While being arrested, defendant pushed, kicked and spit at police officers. Though the domestic abuse against his child's mother was dropped, he pled guilty to the battery against the police. PSR ¶ 43.

Additionally, though defendant scolds the Metropolitan Correctional Center and the Bureau of Prisons for not giving him any mental health services, a deep dive into his medical history at the Metropolitan Correctional Center tells a different story. PSR ¶ 84, 86. The probation report also details defendant's lack of self-determination in seeking mental health services while he was not in custody. PSR ¶ 85. Defendant stated that his current detainment has improved his mood and outlook on life. PSR ¶ 89.

Though the defendant only has three criminal history points based on two juvenile adjudications and the battery mentioned above, he currently has *four* open cases in Cook County for a variety of charges, including a felony for criminal damage to government property. PSR ¶¶ 46-49. Defendant has open warrants in those cases, one of which was issued prior to his arrest and detainment in this case. PSR ¶¶ 46-49.

On the date of the incident, defendant and his child's mother left his then two- or three-year-old son at home or with another person so they could go downtown and loot and cause mayhem. He then previewed his bad behavior on Facebook Live for all to see. Once downtown, the defendant and his passenger were part of a mob of wrongdoers that hijacked a peaceful protest and devolved the cause into a night of chaos.

Accordingly, defendant's history and characteristics support a sentence within the advisory guidelines range of 41 to 51 months' incarceration.

### C. Sentencing Disparities

In his sentencing memo (same as co-defendant Stewart), defendant compared his case to others that have been prosecuted throughout the nation. However, defendant only looked at the sentence imposed on each individual and came to the conclusion that a sentence within the guideline range in this case would cause an unwarranted sentencing disparity. That is simply not the case. A closer look at those cases through the sentencing memorandums filed by the parties show that each situation was different from the case at hand and a guideline sentence is appropriate in this instance.

It should be noted that the sentences for each individual were viewed through its own lens and was personally structured towards the needs for each defendant and situation. That is what the court should do here, as a guideline sentence is warranted in this situation. A brief discussion of those sentences is below.

## United States v. Timothy O'Donnell, Northern District of Illinois, *20 CR 260*

Timothy O'Donnell's case is distinguishable. As was outlined in Taylor's sentencing memo, Timothy O'Donnell was sentenced to 34 months' incarceration after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

Additionally, it should be noted that O'Donnell had significant mental health issues that were outlined in court on various occasions (detention and sentencing hearings) and that was taken into consideration by the judge in her final sentence.

## United States v. Jacob Fagundo, Northern District of Illinois, *21 CR 195*

Jacob Fagundo's case is distinguishable. As was outlined in Taylor's sentencing memo, Jacob Fagundo was sentenced to 3 years' probation after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

After the arsons and violence following the death of George Floyd law enforcement in the Chicago area sought to find individuals responsible for those acts.

14

In an attempt to find the individuals, law enforcement broadcast pictures of the offenders on the internet and in newscasts. Fagundo, unlike the defendant, turned himself into law enforcement once he saw his picture on broadcasts. Fagundo also availed himself to the government for a proffer and had no criminal history at all. His guidelines were 8 to 14 months' incarceration. Taylor, on the other hand, has a guidelines range of 41 to 51 months.

## US v. James Massey, Northern District of Illinois, 21 CR 142

James Massey's case is distinguishable. As was outlined in Taylor's sentencing memo, James Massey was sentenced to 15 months' incarceration after pleading guilty to a single count of inciting a riot and participating in and carrying on a riot, a crime that carried a maximum sentence of five years' imprisonment. Though defendant in this case has pled to a similar charge of civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

Additionally, the facts in Massey's case are clearly distinguishable in that Massey's case involved Massey assembling individuals to steal merchandise and the breaking into stores and stealing of merchandise. Massey's case did not involve the defendant participating in an arson in the middle of downtown Chicago.

Finally, Massey had no criminal history and a guidelines range of 24 to 30 months, whereas Taylor has a criminal history and a guidelines range of 41 to 51 months.

**US v. Bryce Michael Williams, et. al, District of Minnesota,**

Bryce Michael Williams' case is distinguishable. As was outlined in Taylor's sentencing memo, Williams was sentenced to 27 months' incarceration (along with more than $15,000,000 in restitution) after pleading guilty to conspiracy to commit arson for attempting to burn down a police station in Minneapolis. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

It should be noted that Williams' only conviction was driving with a suspended license, six years prior to his plea, whereas the defendant her has more criminal history. *US v. Williams et. al.*, 20 CR 181, Dkt. 143. Additionally, though the count was similar, conspiracy to commit arson, Williams and his co-defendants attempted to light a police station on fire whereas, Taylor and his co-defendants were successful in committing the arson of the CTA van.

**Davon De-Andre Turner**

Davon De-Andre Turner's case is distinguishable, but more in line with the sentence the government is seeking here. As was outlined in Taylor's sentencing memo, Turner was sentenced to 36 months' incarceration (along with more than $15,000,000 in restitution) after pleading guilty to conspiracy to commit arson for attempting to burn down a police station in Minneapolis. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

In Turner's case, Turner and an unindicted co-conspirator worked together to light an incendiary device on fire and walk into a Minneapolis Police station. *US v. Williams, et. al.*, 20 CR 181, Dkt. 120. In the case at hand, Taylor and his cousin lit multiple fires and burned down a CTA van.

**Dylan Shakespeare Robinson**

Dylan Shakespeare Robinson's case is distinguishable. As was outlined in Taylor's sentencing memo, Robinson was sentenced to 23 months' incarceration (along with more than $15,000,000 in restitution) after pleading guilty to conspiracy to commit arson for attempting to burn down a police station in Minneapolis. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

In Robinson's case, Robinson lit something that was then thrown by an unknown co-conspirator into the police station. *US v. Williams, et. al.*, 20 CR 181, Dkt. 108. In the case at hand, Taylor and his cousin lit multiple fires and burned down a CTA van.

**Brandon Michael Wolfe**

Brandon Michael Wolfe's case is distinguishable, but more in line with the sentence the government is seeking here. As was outlined in Taylor's sentencing memo, Wolfe was sentenced to 41 months' incarceration (along with more than $15,000,000 in restitution) – a sentence within his guidelines range – after pleading guilty to conspiracy to commit arson for attempting to burn down a police station in

Minneapolis. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

In Wolfe's case, Wolfe rolled a barrel into a fire in the police station in an effort to accelerate the fire. *US v. Williams, et. al.*, 20 CR 181, Dkt. 109. In the case at hand, Taylor and his cousin lit multiple fires and burned down a CTA van.

The court in Minnesota seemed to look at the individual behavior of the defendants and sentence them accordingly. That is what the government seeks here. Due to Taylor's actions of setting the CTA van on fire and his Facebook postings prior to going downtown, the government seeks a guideline sentence.

## US v. Samuel Frey, District of Minnesota, *20 CR 129*

Samuel Frey's case is distinguishable. As was outlined in Taylor's sentencing memo, Samuel Frey was sentenced to 27 months' incarceration (along with more than $33,000 in restitution) after pleading guilty to conspiracy to commit arson. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

It should also be noted that Frey had no criminal history prior to his engagement in his offense, whereas Taylor does have a criminal history. Though Frey was accused of setting a fire in the store, the fire self-extinguished and did not destroy the business. *US v. Frey*, 20 CR 129, Dkt. 114.

**McKenzy Dunn**

McKenzy Dunn's case is distinguishable. As was outlined in Taylor's sentencing memo, McKenzy Dunn was sentenced to three years' probation after pleading guilty to conspiracy to commit arson. Though defendant in this case has pled to conspiracy to commit arson, he has also pled guilty to civil disorder, a separate charge carrying an additional five-year maximum sentence.

It should also be noted that the guideline range for Dunn was 24 to 30 months' incarceration, whereas Taylor's guidelines range is 41 to 51 months. In Dunn's case, The government, in its sentencing memo, requested a below guidelines sentence of 6 to 12 months' incarceration. Dunn had no criminal history prior to her engagement in this offense, whereas Taylor has a criminal history. Though Dunn conspired with others to commit the arson, her behavior consisted of asking for a lighter and pouring hand sanitizer over a fire. *US v. Frey*, 20 CR 129, Dkt. 86. Behavior that is far less egregious than Taylor's behavior here.

## US v. Latrol Newbins, District of Utah, *20 CR 182*

Latrol Newbins's case is distinguishable. As was outlined in Taylor's sentencing memo, Latrol Newbins was sentenced to 13 months' incarceration after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying a five-year maximum sentence.

It should also be noted that the guideline range for Newbins was 27 to 33 months' incarceration, whereas Taylor's guidelines range is 41 to 51 months'

19

incarceration. Additionally, as was pointed out in his sentencing memo, Newbins went to protest in peace. He "helped lead the crowd, calling for justice and highlighting that this march was peaceful." While talking about a previous protest that turned violent and destructive he stated, "'Saturday was a mockery'" and "'We're here for peace.'" *US v. Newbins*, 20 CR 182 Dkt. 328. This is opposite of why Taylor went downtown. He was not there to protest. He went to loot and cause mayhem, as was outlined in the Facebook video.

### Lateesha Richards

Lateesha Richards's case is distinguishable. As was outlined in Taylor's sentencing memo, Lateesha Richards was sentenced to 20 months' incarceration after pleading guilty to a one count information charging her with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

It should also be noted that the guideline range for Richards was 37 to 46 or 27 to 33 months' incarceration (depending on the guidelines adopted by the court), whereas Taylor's guidelines range is 41 to 51 months. Additionally, as was pointed out in her sentencing memo, Richards did not set a fire. She was accused of throwing a bat and vandalizing an overturned vehicle. Additionally, it was noted that video showed her peacefully speaking with the police. *US v. Newbins*, 20 CR 129, Dkt. 274. Here, Taylor set a fire to a CTA van, an act way more dangerous that anything for which Richards was accused.

20

**Jackson Patton**

Jackson Patton's case is distinguishable. As was outlined in Taylor's sentencing memo, Jackson Patton was sentenced to 24 months' incarceration after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

It should also be noted that the guideline range for Patton was 37 to 46 months' incarceration, whereas Taylor's guidelines range is 41 to 51 months' incarceration. Patton was accused of attempting to recruit others to join in the riots and stomping on police cars and intimidating individuals. *US v. Newbins*, 20 CR 182, Dkt. 284. Here, as has been previously stated, Taylor set fire to a CTA van in an effort to start a riot.

**Larry Williams**

Larry Williams's case is distinguishable. As was outlined in Taylor's sentencing memo, Larry Williams was sentenced to 24 months' incarceration, *within his guideline range* of 21 to 27 months' incarceration, after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence. Williams had no criminal history prior to his engagement in his offense, whereas Taylor has a criminal history of VI.

**Christopher Rojas**

Christopher Rojas's case is distinguishable. As was outlined in Taylor's sentencing memo, Christopher Rojas was sentenced to 13 months' incarceration after pleading guilty to a one count information charging him with civil disorder. Though defendant in this case has pled to civil disorder, he has also pled guilty to conspiracy to commit arson, a separate charge carrying an additional five-year maximum sentence.

It should also be noted that the guideline range for Rojas was 21 to 27 months' incarceration, whereas Taylor's guidelines range is 41 to 51 months. Rojas had no criminal history prior to his engagement in his offense, whereas Taylor has a criminal history.

Accordingly, a sentence within the guideline range of 41 to 51 months is warranted and would not be disparate to other sentences imposed.

**D. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Afford Adequate Deterrence**

Defendant's behavior and video on Facebook reveal a person that had no interest in seeking justice for the murder of George Floyd. In one of the most racially charged moments in the history of our country, the defendant went to downtown Chicago to look for opportunities for himself. He used a tragedy for his own benefit and enjoyment, trying to take the opportunity to capitalize on the pain of others. In doing so, he set fire to a CTA van in an effort to cause mayhem. He knew why he was headed downtown that day and said as much in his video recording prior to getting

downtown when he stated, "I'm really down here for the bull[expletive] too though" and "We come down here ready to catch a [expletive] case. I don't give no [expletive]."

It bears repeating just how turbulent that evening and weekend were in Chicago. It was the most violent and deadly weekend in over thirty years, with 18 murders in a 24-hour span, and 85 people shot and 24 killed over the three-day weekend. *See* https://www.bbc.com/news/world-us-canada-52984535 (last visited December 12, 2022). That is horrific. While defendant is not responsible for all that criminal conduct, defendant contributed to the lawlessness and violent mindset in the city. His conduct also pulled some of the resources of the city away from that violence to attend to the chaos he created in the Loop. This case calls out for a sentence to promote respect for the law.

There is also a need for a sentence that sends a message to the public that chaos and destruction will be met with severe consequences. Not every participant in criminal conduct during a riot or civil unrest will be identified. But it is imperative that those who are receive significant punishment for their actions.

## III.  GOVERNMENT'S POSITION ON SUPERVISED RELEASE

The government has no objections to the conditions of supervised release recommended by the Probation Office, and the government submits that a period of supervised release of three years is appropriate. The government also agrees with the special conditions and discretionary conditions of supervised release, as recommended by the Probation Office.

## IV.  CONCLUSION

For the foregoing reasons, the government respectfully submits that a Guidelines sentence is appropriate here, and requests that the Court sentence defendant Lamar Taylor to a term of imprisonment within the Guideline range of 41 to 51 months, followed by three years of supervised release.

Date: December 13, 2022          Respectfully submitted,

                                 JOHN R. LAUSCH, JR.
                                 United States Attorney

                          By:    */s/ Albert Berry III*
                                 ALBERT BERRY III
                                 Assistant United States Attorney
                                 United States Attorney's Office
                                 219 South Dearborn Street, Fifth Floor
                                 Chicago, Illinois 60604
                                 (312) 886-7855